2019 IL App (1st) 142019-B
No. 1-14-2019
Opinion filed September 23, 2019

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 11 CR 14395 |
| MARKELL HORTON, | ) ) | The Honorable Lawrence E. Flood, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Walker* concurred in the judgment and opinion.
Justice Pierce dissented, with opinion.

**OPINION**

¶ 1     Pivotal changes in Illinois law dealing with the carrying of firearms, partly mandated by United States Supreme Court rulings, have exacerbated legal and practical issues for police. Foremost, police still must enforce the mandate to reduce gun violence and remove illegal firearms from the streets. Presumably acting on that laudable desire, an officer had a hunch, based on seeing "a metallic object" in Markell Horton's waistband, and pursued him. Eventually, police

_____

*Justice Walker replaces Justice Neville, who was appointed to the Illinois Supreme Court after the court issued its original opinion.

found a handgun hidden under a mattress in the bedroom where they found Horton and charged him with the handgun's possession.

¶ 2 In our initial decision, issued in the aftermath of *People v. Aguilar*, 2013 IL 112116, we reversed the trial court's denial of Horton's motion to quash his arrest and suppress a gun found during the search. *People v. Horton*, 2017 IL App (1st) 142019. In *Aguilar*, the court declared facially unconstitutional a portion of the aggravated unlawful use of a weapon statute under which Horton had been convicted. Then, our supreme court issued *People v. Holmes*, 2017 IL 120407, finding that the void *ab initio* doctrine applied in *Aguilar* did not retroactively invalidate probable cause to arrest. We were ordered to vacate our decision and reconsider. To this end, we requested the parties submit supplemental briefs on the impact of *Holmes.* Under *Holmes*, the void *ab initio* doctrine no longer factors into our analysis. Nonetheless, our decision today reaches the same result.

¶ 3 Horton argues the trial court erroneously denied his motion to quash arrest and suppress evidence. He contends that officers lacked probable cause to believe he was committing a crime and thus had no lawful basis to arrest him. Specifically, Horton claims that the officers' observation of a metallic object and Horton's subsequent flight into a house did not amount to probable cause of criminal activity. Alternatively, Horton argues that the officers lacked reasonable suspicion to chase him into the house and perform a *Terry* stop.

¶ 4 The State counters that the record supports the belief of police officer Roderick Hummons that Horton had a gun and, thus, a finding of probable cause to arrest. The State also highlights Horton's flight as supporting probable cause. Once in the house, the State contends, Horton cannot challenge the officers' pursuit because he had no expectation of privacy. Alternatively, the

State suggests that the doctrine of "hot pursuit" protects the officers' actions, assuming Horton could challenge their entry into the house.

¶ 5 We agree with Horton and find that the trial court erred in denying his motion to suppress. The record unambiguously establishes that Horton was under arrest after officers chased him into the house and before they discovered the gun. Because Horton was under arrest, the officers must have had probable cause, more than reasonable suspicion, to believe he was committing a crime. At the outset, we find that the record does not support a conclusion that Hummons had cause to believe that Horton possessed a gun at all. The trial court found that Hummons's observations led him to believe that Horton "may or may not" have had a gun. Deferring to that factual finding, as we must, we conclude that Hummons had no more than a hunch. We also find that, even if Hummons reasonably believed Horton had a gun, he was not aware of any facts that would have led him to believe that Horton's possession was criminal.

¶ 6 Because we find no cause to believe that Horton was committing a crime based on the observation of a metallic object that "may or may not" have been a gun, we reject Hummons's reliance on Horton's flight into the house. Illinois courts repeatedly hold that flight, without more, cannot result in a finding of reasonable suspicion, let alone probable cause.

¶ 7 We also are mindful of the reluctance of black men interacting with police, as courts around the country and a Department of Justice report on policing in Chicago have recognized. This record does not support, and we do not find, any racial element to the interaction; even so, we cannot ignore the well-documented, reasonable, and noncriminal impulse to avoid interactions with police. Finally, the record contains no facts that would justify a finding of probable cause to arrest Horton once officers followed him into the house. Taken together, we conclude that Horton's arrest was not justified by probable cause and, accordingly, unlawful.

¶ 8     We also find that suppression is the appropriate remedy. The State has contested Horton's ability to seek suppression of the gun because officers found it in a house where he has no expectation of privacy. We disagree. The text of the fourth amendment protects an individual interest in being free from unreasonable seizures. That interest does not disappear merely because a person does not have a privacy interest in their location at a given moment. Suppression of evidence always exists as a remedy for a fourth amendment violation so long as the discovery of that evidence is sufficiently linked to the unlawful police conduct. Here, officers discovered the gun immediately after and as a direct result of Horton's arrest. Under long-settled fourth amendment principles, the gun's discovery is the fruit of Horton's unlawful arrest and must be suppressed. Because the State could not succeed on remand without this evidence, we reverse Horton's conviction outright.

¶ 9     Horton raises three more arguments. He contends the State failed to prove him guilty beyond a reasonable doubt, the trial court improperly excluded evidence of the registration and ownership of the firearm seized by the police, and his counsel was ineffective for failing to introduce evidence that another person owned the gun officers discovered. Because we reverse Horton's conviction on the ground that the officers unlawfully obtained the gun, we need not address these arguments.

¶ 10                               Background

¶ 11     The State charged Horton with seven gun-related counts, but elected to proceed only on one charge, that of armed habitual criminal (knowingly possessing a firearm after being convicted of two qualifying felonies), a Class X felony. 720 ILCS 5/24-1.7 (West 2010).

¶ 12                  *Motion to Quash Arrest and Suppress Evidence*

¶ 13　　　　Before trial, Horton filed a motion to quash the arrest and suppress evidence. He argued that the police had no warrant and no probable cause to arrest him, and so the evidence connecting him with the gun came within the purview of the exclusionary rule and should have been suppressed as the fruit of the illegal arrest. See *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wong Sun v. United States*, 371 U.S. 471 (1963).

¶ 14　　　　The only witness at the hearing on the motion to quash, Chicago police officer Hummons, testified that around 3 p.m. on August 11, 2011, while on patrol in an unmarked police car, he and his partner, Officer Nyls Meredith, drove past a house at 6901 East End Avenue, Chicago. Hummons saw two people on the porch, and Horton standing in front of them. At that point, Hummons thought Horton lived in the house. Hummons did not see Horton violate any law.

¶ 15　　　　Horton looked in Hummons's direction. When he did, Hummons noticed a "metallic object in his waistband." According to Hummons, he told Meredith, who was driving, to stop. As the officers were getting out, Horton turned and rushed inside the house. Hummons claimed he found a set of keys on the ground and, about five minutes later, used the keys to unlock the door. Hummons and Meredith let themselves inside.

¶ 16　　　　Hummons went upstairs because he heard a noise there. He saw Horton in one of the bedrooms crouched next to a bed. Hummons thought Horton was "concealing an item." Hummons detained Horton. Meredith recovered a handgun from under the mattress. The handgun appeared to Hummons to be what he saw sticking out of Horton's waistband. Horton told Hummons that he did not live at the house, the bedroom was not his, and neither was the gun.

¶ 17　　　　Defense counsel questioned Hummons about his preliminary hearing testimony, the transcript of which is not included in the record. At the preliminary hearing, Hummons said nothing about the object being or appearing to be a butt of a handgun, only a "chrome metal

object." Defense counsel asked, "you could have said you saw a gun, but you didn't believe you saw a gun yet, isn't that true?" Hummons replied, "[t]hat's correct." Hummons then stated that what he saw in Horton's waistband when he was outside was shiny, a "very chrome weapon."

¶ 18       Defense counsel asked whether the weapon had a wooden handle. Hummons testified that it had wooden grips, but the grips covered only part of the handle and the remainder was metal. He said the handle had chrome around it and a chrome "slide."

¶ 19       The parties stipulated that a "firearms receipt" and "work sheet report" Hummons prepared described the gun as a Taurus with a black handle, not a chrome handle.

¶ 20       The State argued that Horton was not "seized at any point" until the gun was recovered. Horton had no reasonable expectation of privacy in the bedroom, but even if he did, the officer was acting in "hot pursuit" and exigent circumstances justified taking Horton into custody and recovering the handgun without either an arrest or search warrant.

¶ 21       Horton pointed out that Hummons's testimony varied from that of his preliminary hearing testimony in which he said he saw a "metal object." Horton maintained that his entry into the house did not justify the officers' entry. Finally, Horton asserted that no evidence suggested the officers obtained any information from the people on the porch about who lived in the house, nor was Hummons aware that Horton did not live there.

¶ 22       The trial court denied Horton's motion, finding Hummons's testimony as credible. The trial court found that Hummons had reasonable grounds to believe that a crime may have been or was being committed. Hummons did not know whether it was Horton's house, but "the officer chase[d] him into the house. It took some time because the keys—the officer's in hot pursuit. Legally he can pursue a person into that house."

¶ 23       *Motion In Limine Regarding Gun Ownership*

¶ 24　　After the suppression hearing but before trial, the State orally moved to preclude Horton from introducing evidence regarding the gun's ownership and whether the gun was stolen. Horton sought to introduce as a business record a document from the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives National Tracing Center naming the owner and showing that the weapon was not stolen. The State moved *in limine* to exclude the document. The trial court granted the motion, reasoning that the document was not self-authenticating and needed either a certification or the testimony of a foundation witness. The State also made an oral motion to bar reference to statements Horton made regarding the gun's ownership. Horton sought to elicit evidence that he and Hummons had a conversation about the gun. The trial court granted the State's motion.

¶ 25　　　　　　　　　　　　　Trial Testimony

¶ 26　　At trial, Hummons testified that he and Meredith were on patrol on the south side of Chicago in an unmarked police car. Meredith drove slowly while Hummons scanned the neighborhood. As they passed a row house at 6901 East End Avenue, Hummons noticed an unidentified woman and man standing on the porch. Horton was standing with his back to the street, some two to three feet away from the porch and not quite at the sidewalk. Hummons made eye contact with Horton and noticed a "bulge" on the right side of his waist that had the "characteristics of a weapon." Horton was wearing a T-shirt. Horton then turned toward the house, and "his shirt raised a little" giving Hummons "a glimpse of a chrome metallic object" that he thought was the butt of a handgun.

¶ 27　　Hummons told Meredith to stop and back up. As the two officers got out of the car, Horton rushed into the house and locked the door. Hummons followed him and tried the door. He and Meredith then detained the two people on the porch. Hummons stated that when the woman

stood up, he noticed a set of keys near where she had been sitting. Hummons and Meredith called for backup. The backup arrived about five or six minutes later. Then, Hummons used the keys to unlock the front door. Hummons believed Horton had a gun in public. He did not know whether the house belonged to Horton or someone else.

¶ 28    Hummons entered the house first, followed by Meredith. They saw no one on the first floor. Hummons heard noise on the second floor and went upstairs. There were two bedrooms. Hummons went to the bedroom straight ahead; Meredith went to the other bedroom. Hummons saw Horton crouching by the side of a bed. Hummons could not see Horton's hands. Hummons entered the bedroom with his gun drawn and ordered Horton to raise his hands and come out. At the same time, Meredith detained someone in the other bedroom. After the two were sent downstairs to the backup officers, Hummons told Meredith to check the bed where Horton had been crouching. Meredith recovered a chrome, semiautomatic handgun from under the mattress. Meredith checked the magazine and unloaded it. Hummons testified that the gun was the same gun he had seen in Horton's waistband minutes earlier. When the State asked how much of the gun was showing when Hummons saw it in Horton's waistband, Hummons said he saw "[j]ust behind the handle portion and back." He did not see the trigger mechanism or the barrel, but the part he did see was silver metallic as well as a darker grip color.

¶ 29    On cross-examination, defense counsel questioned Hummons about his testimony at the preliminary hearing. When Hummons testified that he saw a "chrome metal object" and "could not tell what it was," defense counsel asked, "[b]ut today you told the ladies and gentlemen of the jury that you could tell what it was?" Hummons replied, "[y]es. It appeared to me to be a weapon, the butt of a handgun." Hummons testified at the preliminary hearing that he did not see Horton

"make contact with" the gun found under the mattress. Hummons acknowledged that the handgun was not examined or preserved for fingerprints or DNA.

¶ 30    Defense counsel questioned Hummons regarding parts of his testimony left out of the original incident report and the arrest report. Included in Hummons's testimony but not the reports was that (i) Hummons saw a bulge on Horton's hip, (ii) Hummons saw the butt of a weapon, (iii) Hummons saw the handle of a weapon, (iv) Hummons heard noise upstairs, and (v) someone was in the other bedroom. Also missing from the reports was that (vi) Horton went inside and locked the door.

¶ 31    On recross, Hummons admitted that he never saw a gun in Horton's hand. Hummons said that as a police officer, he did not have the authority to submit evidence for fingerprints or DNA. Detectives submitted weapons recovered by the police for testing, and a detective was not assigned to the case. Although he could have done so, Hummons failed to call for an evidence technician to recover the weapon.

¶ 32    Meredith testified he was driving when Hummons told him to stop and back up. He reversed, and Hummons jumped out of the car and began to run. Meredith ordered the two individuals on the porch to his car, and they complied. He called for assistance, which arrived in about five to six minutes. Then, he and Hummons entered the house using the keys. They went upstairs and saw two bedrooms. Meredith went into the bedroom to the left, where he found a man lying in the bed, while Hummons went into the other bedroom. Meredith brought the man out into the hallway where Hummons had Horton detained, and the two officers directed the men downstairs. Hummons told Meredith to search the area of the bed where Horton was crouching. Meredith saw a "bulge" in the mattress and found a handgun underneath. The gun was a semiautomatic handgun with a chrome finish and a black plastic handle.

¶ 33    Meredith said that when he was driving, he had an unobstructed view of three people in front of the house, and first saw Horton from a block to a block and a half away. When Meredith pulled the car up, Horton stood about six feet away. Horton ran into the house and Hummons ran after him. When Meredith and Hummons entered the house, they had their guns drawn and announced "Chicago police" several times. Meredith never saw a bulge in Horton's waistband, never saw Horton in the bedroom, and never saw Horton place the gun under the mattress. Also, Hummons never told him he had seen a weapon.

¶ 34    The prosecutor asked, "What does it mean to inventory a weapon?" Meredith answered:

"When you inventory the weapon you get back to the station and what you want to do is get all the characteristics off the weapon, the type of weapon it is, something similar to what I explained when I was giving my testimony. You let them know how many rounds. They want to know if you do have an offender in custody, which we did. We gave the basic information from the defendant's name, his information, and what he had. And then from there you let—from there, once you give them all the characteristics of the gun, the serial number, they take a few minutes because they have their own system, they look up to see what is going on with the gun, whether it is registered or whatever the case may be. Once you get that information from them you indicate that in your paperwork to see if the gun is stolen, registered."

At this point defense counsel objected, and after a sidebar the trial court ruled the door to admitting the evidence of the gun registration was not opened because Meredith had not indicated whether or not the gun was stolen. The trial court then instructed the jury: "Ladies and gentlemen, I am striking the last portion of the officer's answer. You are going to disregard that portion of his answer."

¶ 35    On redirect, Meredith stated he saw Horton's back as he rushed inside but could not see Horton's right side.

¶ 36    The State entered into evidence certified copies of Horton's convictions in 1998 and 2003 for possession of a controlled substance with intent to deliver. The parties stipulated that these convictions were qualifying felonies for the purpose of the armed habitual criminal charge.

¶ 37    After the State rested, the trial court denied Horton's motion for a directed verdict.

¶ 38    Corey Beattie testified for the defense. Beattie had known Horton for about 10 years. Beattie lived in the two-bedroom townhome with his 32-year-old half-brother, Deondre Williams. Beattie worked as an independent contractor for a home inspection company, earning $70,000 annually, and would not jeopardize his job by coming to court and lying.

¶ 39    On the day of Horton's arrest, Beattie was upstairs in his bedroom watching SportsCenter on ESPN. Horton had been outside with Williams and Williams's girlfriend for about an hour. About 10 minutes before the police arrived, Horton came into Beattie's room and said the police were outside. Beattie looked out the window and saw police officers searching Williams and Williams's girlfriend. Horton sat in a chair in Beattie's bedroom and the two watched ESPN for about 5 to 10 minutes. Once Horton entered his room, Horton remained in his presence and did not go into Williams's room.

¶ 40    About 10 minutes after Horton entered his room, Beattie heard the police come in and announce "police." Beattie yelled that he and Horton were upstairs. Horton did not leave the bedroom when the police announced their presence. The officers detained Beattie and Horton and took them downstairs. The police officers went back upstairs and returned with a handgun, which Beattie identified as belonging to Williams.

¶ 41    The bedroom the officers searched belonged to Williams. Beattie had seen Williams holding the gun in his bedroom the day before and had seen Williams with the gun several times. Beattie did not know where Williams kept the gun.

¶ 42    Horton did not testify.

¶ 43    The jury convicted Horton of one count of armed habitual criminal. The trial court sentenced Horton to 12 years' imprisonment, with a 3-year period of mandatory supervised release.

¶ 44                                    Analysis

¶ 45                *Motion to Quash Arrest and Suppress Evidence*

¶ 46    Horton argues that the trial court erred when it denied his motion to suppress; the police did not have sufficient probable cause to believe he was committing a crime at the time of his arrest. He acknowledges that he had no connection to the townhouse other than he knew the two people who lived there and he happened to be outside in front of the porch. Horton contends the officers, who acted without a warrant, had no probable cause to arrest him and that the gun was found as a result of an unlawful arrest. The State responds that the trial court properly denied the motion because (i) Horton had "no reasonable expectation of privacy in the house" and (ii) the police officers' "hot pursuit" constituted exigent circumstances.

¶ 47    On review, this court defers to the trial court's findings of fact in a motion to suppress and upholds findings unless the trial court's findings and credibility assessments fail to comport with the manifest weight of the evidence. *People v. Absher*, 242 Ill. 2d 77, 82 (2011). We then assess the established facts in relation to the issues presented and draw conclusions to decide what relief, if any, should be granted. *Id.* We review *de novo* the legal question of whether the facts warrant suppression. *People v. Cregan*, 2014 IL 113600, ¶ 22.

¶ 48                                    *Horton's Fourth Amendment Interest*

¶ 49        We begin our analysis by defining the relevant interests at stake. Ordinarily this would be a question of remedy, but we address it first because Horton's ability to offer a fourth amendment claim at all has been contested and because it will be useful in analyzing our probable cause inquiry later. The State contends that our fourth amendment analysis is for naught because Horton did not have an expectation of privacy in the home. Horton replies that the relevant fourth amendment interest for the purposes of our inquiry is his interest in being free from an unlawful *arrest*, not a search of the home, which renders Horton's expectation of privacy in the place searched irrelevant. We agree with Horton.

¶ 50        The United States Supreme Court has long since dispensed with the notion of technical fourth amendment "standing" and has instead centered the inquiry on whether "the disputed search and seizure has infringed an interest of the defendant which the fourth amendment was designed to protect." *Rakas v. Illinois*, 439 U.S. 128, 140 (1978). Illinois courts have employed this doctrinal housekeeping to do away with "the rubric of 'standing,' " focusing on whether the defendant has a personal interest in the challenged police action. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010).

¶ 51        The fourth amendment, by its plain text, protects "[t]he right of the people to be secure in their persons *** against unreasonable searches and seizures." U.S. Const., amend. IV. An arrest is the "quintessential" example of a seizure for fourth amendment purposes. *California v. Hodari D.*, 499 U.S. 621, 624 (1991). It follows that a defendant, even one who does not have a privacy interest in the place searched, may still challenge his or her own arrest and the resulting discovery of evidence as the fruit of that unlawful arrest. *E.g.*, *Kothe v. State*, 152 S.W.3d 54, 61-62 (Tex. Crim. App. 2004) (defendant, a passenger seized as part of traffic stop, had standing to challenge

subsequent search of driver because it would be fruit of the poisonous tree if product of illegal detention); *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1163 (10th Cir. 1995) (interpreting *Rakas* to allow defendant to challenge evidence discovered on boat, after being unlawfully arrested, even though he had no possessory interest in boat).

¶ 52     Certainly, Horton can contest the legality of his arrest; otherwise, a person's interest in his or her freedom from unlawful detention would evaporate as soon as he or she crossed the threshold of a curtilage. That is not the law. Horton has validly challenged his own arrest, and he may seek suppression of any evidence obtained as a result of the arrest when the arrest is unlawful.

¶ 53                                                   Probable Cause

¶ 54     Before addressing the suppression remedy, we determine whether probable cause existed for Horton's arrest. Probable cause exists where an arresting officer has knowledge of facts and circumstances that would have led a reasonable person to conclude the defendant has committed or is committing a crime. *People v. Jones*, 215 Ill. 2d 261, 273-74 (2005) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)). This determination of probable cause must be based on facts known to the police at the time of the arrest, not the officer's subjective belief. *People v. Lee*, 214 Ill. 2d 476, 484 (2005) (citing *People v. Chapman*, 194 Ill. 2d 186, 217 (2000)).

¶ 55     Ultimately, the probability of criminal activity and common-sense considerations, not proof beyond a reasonable doubt, determines whether probable cause has been established. *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986) (citing *People v. Tisler*, 103 Ill. 2d 226, 236 (1984)). At the same time, probable cause is "more than bare suspicion." *Jones*, 215 Ill. 2d at 273; see *People v. Bunch*, 327 Ill. App. 3d 979, 983-84 (2002) ("Suspicions, no matter how reasonable, do not add up to probable cause to arrest.").

¶ 56    In our first opinion, we held that the mere observation of a gun, absent other evidence of criminal activity, could not provide probable cause for arrest after *Aguilar*, 2013 IL 112116 (prohibition on possession of firearms outside home (720 ILCS 5/24-1.6(a)(1), (a)(3)(A)) facially unconstitutional). In his supplemental brief, Horton argues that, even in light of *Holmes*, the officers "did not have probable cause to arrest [him]." The State maintains "that the trial court properly denied [Horton]'s motion to quash arrest and suppress evidence." While the invalidation of the relevant portion of the aggravated unlawful use of weapons (AUUW) statute can no longer serve to eliminate probable cause for arrests that pre-date *Aguilar*, our ultimate conclusion remains unchanged—the officers still lacked probable cause to arrest Horton even with the AUUW statute on the books.

¶ 57    We find that the record does not support a finding of probable cause to believe that Horton had a gun at all. Hummons testified on direct examination at the hearing on the motion to suppress that he did not see Horton violate any law. As Hummons and Meredith slowed down, Horton looked in Hummons's direction. When he did, Hummons noticed a "metallic object in his waistband." On cross-examination by the assistant state's attorney, Hummons again stated he "noticed that [Horton] had a metallic object in his waistband." When asked, "you in fact recognized it to be the butt of a handgun, correct?" he answered, "correct." On redirect, counsel asked a series of questions about Hummons's prior testimony at the preliminary hearing:

"Q. Do you recall testifying at a preliminary hearing in this case?

A. I do.

Q. Do you recall using under oath the phrase of words chrome metal object?

A. Yes.

Q. You could have—you're an experienced officer—you could have said

you saw a gun, but you didn't believe you saw a gun yet, isn't that true?

A. That's correct."

Ultimately, the officer's equivocal testimony led to the trial court's factual finding (which the State urges us to follow) that Hummons saw what "he believe[d] *may or may not* be a weapon." A belief that a defendant "may or may not" possess a weapon is simply a hunch and does not reach the threshold of probable cause.

¶ 58 Even if we could conclude that Hummons had probable cause to believe Horton had a gun, we would still find that his observations did not lead to probable cause to believe that Horton was committing a *crime*. In *Holmes*, our supreme court held that the void *ab initio* doctrine could not retroactively invalidate a determination of probable cause based on the AUUW statute that had later been declared unconstitutional. *Holmes*, 2017 IL 120407, ¶ 39. Horton was arrested in 2011, before the decision in *Aguilar*. As a result, *Holmes* prevents us from relying on *Aguilar* to find that the officers lacked probable cause to arrest Horton based on their observation of what "may or may not" have been a gun.

¶ 59 Taking the law as it existed before *Aguilar*, there still was not probable cause to believe that Horton was committing a crime at the time of his arrest. The AUUW statute, even before *Aguilar*, allowed a citizen to carry a gun "when on his or her land or in his or her abode" or when "on the land or in the legal dwelling of another person as an invitee with that person's permission." 720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2012). Based on Hummons's trial testimony, we know that Horton was standing "maybe two or three feet in front of the porch, almost on the sidewalk but not quite." Nothing in the record suggests that Hummons had any

reason to believe, at the time of the arrest, the Horton was not standing in his own yard or a friend's yard. In other words, no reason to believe that Hummons was committing a crime.

¶ 60 The State argues that we cannot consider trial testimony unless it is for the purpose of affirming Horton's conviction, citing *People v. Brooks*, 187 Ill. 2d 91, 127-28 (1998). Since *Brooks*, appellate decisions have repeatedly held that its limit applies only to considering trial evidence where a defendant fails to renew his or her objection to the denial of the suppression motion in a posttrial motion. *People v. Gill*, 2018 IL App (3d) 150594, ¶ 76; *People v. Brannon*, 2013 IL App (2d) 111084, ¶ 22. Indeed, the court in *Brooks* left that possibility open. *Brooks*, 187 Ill. 2d at 128. Horton renewed his objection to the trial court's denial of the motion to suppress in his motion for a new trial. Because "a pretrial ruling on a motion to suppress is not final" until judgment is final, Horton's inclusion of the suppression issue in his motion for a new trial permits us to consider trial evidence as part of our analysis. *Id.*

¶ 61 We do not base our conclusion about probable cause on the particular statutory offense the State charged. We describe probable cause in terms of the AUUW statute because, at the time of Horton's arrest, it was the sole offense that criminalized pure possession of a gun. We are unaware of any gun offense in the Criminal Code of 2012 that Hummons could have reasonably suspected Horton of committing based on the mere observation of what "may or may not" have been a gun. See Appendix, *infra* ¶ 114. Even assuming that Hummons thought he saw a gun (a dubious conclusion, as we have indicated), he did not testify to any articulable fact that gave rise to suspicion that Horton was committing a gun-related crime.

¶ 62 This evidence contrasts with the facts of *Holmes*, where the police officers unequivocally testified that they saw a revolver tucked in the defendant's waistband. *Holmes*, 2017 IL 120407, ¶ 5. The supreme court did not discuss whether the arresting officer's probable cause,

apart from the invalidated statute, was itself valid. A warrantless arrest cannot be justified by what is found during a subsequent search incident to the arrest. *Lee*, 214 Ill. 2d at 484 (citing *People v. Beattie*, 31 Ill. 2d 257, 260 (1964)). We have carefully and thoroughly reviewed the record, and find the evidence established no basis for probable cause other than a hunch that the metallic object might be a handgun. Moreover, the State does not provide a different basis for probable cause.

¶ 63       The State, however, points to a second factor as justifying the officers' actions: Horton's quick steps from the porch and into the house. "Headlong flight" after a suspect sees the police is "a pertinent factor" in assessing an officer's suspicion of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000); *People v. Jones*, 196 Ill. App. 3d 937, 956 (1990). But, of equal merit, flight alone does not connote criminal activity. *Jones*, 196 Ill. App. 3d at 956.

¶ 64       We cannot read *Wardlow* out of context. There, the officers were traveling as part of a caravan of four police cars intentionally entering an area known for heavy narcotics trafficking. *Wardlow*, 528 U.S. at 121. They were converging on the area specifically because they believed there would be a large group of people engaging in drug transactions. *Id.* Wardlow was standing on the street holding an opaque bag and fled on seeing the officers. *Id.* at 121-22. The Supreme Court found important Wardlow's location in a place known for drug activity in addition to his flight as a basis for finding reasonable suspicion to detain him. *Id.* at 124-25.

¶ 65       Horton's situation differs dramatically. Of most significance, the defendant in *Wardlow* chose not to challenge his arrest; he challenged only his initial detention. *Id.* at 126. As a result, the Supreme Court considered the lower standard of reasonable suspicion as opposed to the more exacting standard of probable cause. *Id.* at 123. Here, there can be no dispute that Horton was arrested when he was seized inside the house, meaning the officers had to have probable cause to

support their actions. The dissent would apply the lesser reasonable suspicion standard by finding that "Officer Hummons's initial contact with [Horton] amounted to a *Terry* stop." *Infra* ¶ 101. What contact? Horton went inside the house immediately on seeing the officers. Even assuming the officers' exit from their car amounts to a sufficient show of authority to constitute a seizure (a dubious proposition), a person is not seized until he or she *submits* to an officer's authority. *California v. Hodari D.*, 499 U.S. 621, 629 (1991). In other words, there was no interaction between Horton and the police with any fourth amendment implications until officers formally arrested Horton. An arrest requires probable cause, not reasonable suspicion.

¶ 66     Additionally, as far as the testimony reveals, no circumstances surrounding Horton's flight make it as suspicious as the flight in *Wardlow*. We have already found that Hummons's belief that he saw a gun, even if we could accept it as reasonable, did not give him cause to believe a crime was being committed given the facts that he knew. Similarly, no testimony indicates the officers believed the neighborhood to be dangerous, or that they were investigating or saw anything indicating other criminal behavior. *Wardlow* is distinguishable and does not control.

¶ 67     Illinois law dictates the same outcome. Our courts routinely find that running from the police is not even sufficient to establish *reasonable suspicion* unless other circumstances indicate suspicious or illegal behavior. *E.g.*, *In re D.L.*, 2017 IL App (1st) 171764, ¶ 29 (no reasonable suspicion where "aside from [respondent's] flight, there was no testimony showing that respondent was acting suspiciously in any way"); *People v. Harris*, 2011 IL App (1st) 103382, ¶ 15 (evidence of flight, "[g]iven the dearth of contextual evidence" suggesting any other criminal activity, was insufficient to justify even *Terry* stop); see also *In re D.W.*, 341 Ill. App. 3d 517, 526 (2003) (flight established reasonable suspicion but would not have constituted probable cause to arrest). Again, because we have found that the conclusion that Horton had a gun to be both

unsupported by the evidence and not evidence of a crime regardless, only Horton's flight can be the basis for the officers to chase him into the house and arrest him. This they cannot do.

¶ 68    While we are satisfied that the law as announced by both the United States Supreme Court and Illinois courts supports our analysis of Horton's flight, we are reassured that we have reached the correct result by the decisions in fellow state courts. In particular, from the Massachusetts Supreme Judicial Court, *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016), illustrates problems inherent in criminal jurisprudence regarding investigatory stops by police. The *Warren* court stated flight is relevant to the reasonable suspicion analysis "in appropriate circumstances" but added two cautionary notes regarding the weight to be given this factor. *Id.* at 341. First, the *Warren* court found, relying on a person's freedom to avoid contact with police, that "[w]here a suspect is under no obligation to respond to a police officer's inquiry, we are of the view that flight to avoid that contact should be given little, if any, weight" because otherwise "the boundary between consensual and obligatory police encounters will be seriously undermined." *Id.* at 341-42. Essentially, Horton had two choices. He could stay outside and answer the police's questions and comply with their requests—in Illinois this serves as consent and so would eliminate any ability for Horton to challenge the officers' actions, no matter how unlawful. See *People v. Qurash*, 2017 IL App (1st) 143412, ¶¶ 26-27. Or (in the State's view), he could do what he did and flee inside to avoid unwanted contact with police, only to "turn a hunch into a reasonable suspicion by inducing the [flight] justifying the suspicion." (Internal quotation marks omitted.) *Warren*, 58 N.E.3d at 341. We decline to put Horton, and anyone in similar situations, to this mirage of a choice.

¶ 69    The *Warren* court explained, "where the suspect is a black male stopped by the police on the streets of Boston, the analysis of flight as a factor in the reasonable suspicion calculus cannot

be divorced from the findings in a recent Boston Police Department \*\*\* report documenting a pattern of racial profiling of black males in the city of Boston." *Warren*, 58 N.E.3d at 342 (citing *Commonwealth v. Warren*, 31 N.E.3d 1171, 1186 n.18 (Mass. App. Ct. 2015) (Agnes, J., dissenting, joined by Rubin, J.) (relying on Boston Police Department report on field interrogation and observation data)). The *Warren* court speaks to a troubling reality that young minority men may flee from police to avoid "the recurring indignity of racial profiling" as opposed to attempting to conceal criminal activity. *Id.* at 342.

¶ 70    Like the Massachusetts Supreme Court, we also have the benefit of a report on policing in our most populous urban center. On this score, we take judicial notice of the United States Department of Justice report finding reasonable cause to believe that the Chicago Police Department had engaged in a "pattern or practice" of unreasonable force, and that this practice, even when citizens are physically unharmed, leads to "fear and distrust" from citizens. See U.S. Dep't of Justice Civil Rights Div. & U.S. Attorney's Office Northern Dist. of Illinois, Investigation of the Chicago Police Department, at 23 (Jan. 13, 2017), https://www.justice.gov/ usao-ndil/press-release/file/925976/download (last visited Aug. 27, 2019) [https://perma.cc/ XPN8-64RE]. The report focuses on use of force policies, and while we emphasize that those specific concerns are not present here, the report concludes that many Chicago residents, particularly black and Latino residents, feel that Chicago Police Department officers "assume[ ] that they are the perpetrators of crime" and unfairly target them. *Id.* at 142-43. Most illuminating to Horton's situation, the Chicago police officers employ "jump out squads." *Id.* at 142. This means that they intentionally stop their cars and open the door to see if anyone runs; if they do, the officers give chase. *Id.* In other words, just as the Supreme Court of Massachusetts feared—

"the police could turn a hunch into a reasonable suspicion by inducing the [flight] justifying the suspicion." (Internal quotation marks omitted.) *Warren*, 58 N.E. 3d at 341.

¶ 71        We emphasize that our analysis has nothing to do with the motives of the officers. Nothing in the record or in our opinion suggests they acted out of racial animus. We discuss the decision of the Massachusetts Supreme Court and the Department of Justice report about Chicago police practices to highlight that an eminently reasonable and noncriminal reason explains Horton's actions after seeing the police. The Department of Justice report states that some negative interactions between the police and members of some communities have led to a measurable amount of fear and distrust of police. And thus, one can readily understand why a young black man having a conversation with friends in a front yard would quickly move inside when seeing a police car back up.

¶ 72        Finally, we find that once the officers were inside, they did not observe any additional facts that would have amounted to probable cause to arrest Horton. Before proceeding further, we must determine the point of Horton's arrest. The parties' briefs appear to agree that Horton was arrested in the upstairs bedroom of Beattie. This apparent agreement harmonizes with the trial court's findings at the suppression hearing. The court found that Hummons was "taking [Horton] into custody" in the upstairs bedroom. Hummons's trial testimony also confirms this. After going into the home and going to one of the upstairs bedrooms, Hummons saw Horton and immediately "handcuffed him and detained him." In fact, Hummons expressly testified that Horton was under arrest at that moment.

¶ 73        At the suppression hearing, Hummons testified that he went into the house and found Horton in an upstairs bedroom "crouching next to a bed." Hummons said he saw Horton "doing what [he] believed to be concealing an item" and then detained him. At trial, Hummons testified

that he and his partner went inside and found no one on the first floor. They heard "rumbling" upstairs, and Hummons went up and into the first bedroom on the left. There he saw Horton "crouching down" behind a bed, which was concealing his hands. Hummons told Horton to put his hands up, which he immediately did, and then put Horton into handcuffs and arrested him. According to both the suppression hearing and trial testimony, Hummons's partner found a gun after Hummons arrested Horton.

¶ 74 We do not find that Hummons's observations inside the house amount to probable cause. Again, any suspicion that Hummons had that Horton had a gun was either unreasonable or did not amount to suspicion of a crime. We cannot say that Horton's act of crouching down was suspicious enough to arrest him. This is especially true because Hummons's suppression hearing and trial testimony indicate that five or more minutes elapsed before officers could get inside and upstairs. Based on that, Horton's actions inside the house may or may not have had anything to do with the police. The question before us is whether it amounted to sufficient cause to place him under arrest. We cannot say that it did.

¶ 75 The parties argue about probable cause and reasonable suspicion throughout their briefs. They also do not consistently distinguish between arguments about Hummons's ability to perform a *Terry* stop and an arrest. Our first opinion made this distinction fuzzy as well. *Horton*, 2017 IL App (1st) 142019, ¶ 67 ("officers lacked probable cause for the *Terry* stop"). We use this opportunity to clarify that Horton's arrest occurred when Hummons placed handcuffs on him in the upstairs room. A warrantless arrest must be supported by probable cause, which did not exist here. Because we find Hummons arrested Horton, not merely detained him, we need not address whether the lesser requirements of reasonable suspicion support the arrest.

¶ 76    In sum, we reach these conclusions on probable cause: (i) the record does not support a finding that Hummons could reasonably believe that Horton was carrying a gun in his waistband; (ii) even if the record could support this finding, no evidence known at the time of the arrest supports a reasonable belief that Horton's possession of a gun was criminal; (iii) because there was no reason to believe that Horton engaged in criminal behavior, his flight adds little to the analysis; and (iv) none of the officer's observations, once they entered the home, rose to the level of probable cause to believe Horton was committing a crime.

¶ 77    *Hot Pursuit*

¶ 78    The State briefly argues, relying on the trial court's findings, that the "hot pursuit" doctrine justifies Horton's arrest. We reject the State's arguments because the unconstitutional police action was Horton's arrest, not the entry into the home. The hot pursuit doctrine provides an exception to excuse warrantless entry into a home. *People v. Wear*, 229 Ill. 2d 545, 563 (2008). To rely on hot pursuit as an exception to the warrant requirement, officers must have probable cause at the outset. *Id.* ("we must first determine if [the officer] had probable cause to arrest [the defendant] outside of the residence"). Since we have found no probable cause to believe that Horton was committing a crime based on the officers' observations outside of Beattie's house, the hot pursuit doctrine cannot be used to justify the officers' subsequent actions.

¶ 79    *Suppression*

¶ 80    We now turn to whether evidence seized may be used against Horton. In the first round of briefing, the State argued that we should apply the good-faith exception to the exclusionary rule. The State contended that the officers reasonably relied on the now-void AUUW statute as the basis for probable cause because it had not been ruled unconstitutional. Our first opinion contained a detailed discussion of the good-faith exception, and we explained that it does not

apply in Illinois. *Horton*, 2017 IL App (1st) 142019, ¶¶ 51-55. Because we now find the officers' actions unsupported by probable cause even as the law existed at the time of the arrest, there is no longer any need for our analysis of the good-faith exception. Even the State does not repeat its good-faith arguments in its brief on remand.

¶ 81      The State now argues against suppression for two primary reasons: (i) "[t]he gun was not recovered from [Horton]'s person after he was taken into custody" and (ii) the gun was found in a location in which Horton had no expectation of privacy. We reject both arguments.

¶ 82      As to the first argument, the State offers no authority for the proposition that contraband must be recovered from the person of the arrestee to be suppressed as a result of an unlawful arrest. Unlawful detention can taint a subsequent search. See *People v. Brownlee*, 186 Ill. 2d 501, 521 (1999) (citing *Wong Sun*, 371 U.S. 471). The exclusionary rule extends "as well to the indirect as the direct product" of officers' unlawful conduct. *Wong Sun*, 371 U.S. at 484. We consider not the evidence's location, but "whether the evidence was obtained 'by means sufficiently distinguishable to be purged of the primary taint' of illegality." *People v. Lovejoy*, 235 Ill. 2d 97, 130 (2009) (quoting *Wong Sun*, 371 U.S. at 487-88).

¶ 83      We also find *Wong Sun* to be instructive as to the State's second argument. There, officers unlawfully arrested a man nicknamed "Blackie Toy." *Wong Sun*, 371 U.S. at 473, 484. The court held that Toy's statements to the officers while at his apartment constituted a direct fruit of his unlawful arrest and ordered them suppressed. *Id.* at 487. But, the court went further. After getting information from Toy, the officers went to the apartment of a different man, Johnny Yee. *Id.* at 474-75. They discovered heroin in Yee's dresser drawer. *Id.* The court held that the heroin also had to be suppressed because it was not sufficiently attenuated from the initial illegality of entering Toy's apartment and arresting him. *Id.* at 487-88.

¶ 84     We glean an important lesson from the exclusionary analysis in *Wong Sun*. The evidence found in Yee's apartment was still subject to suppression, despite Toy having no discernible privacy interest, because the officers had unlawfully arrested Toy. Evidence discovered in someone else's home may be subject to suppression when linked to the initial illegality. Applied to Horton, it simply does not matter that he did not reside in the home when the officers discovered the gun. As in *Wong Sun*, the gun was discovered as an immediate product of Horton's unlawful arrest; actually, fewer links exist between Horton's arrest and the gun than between Toy's unlawful arrest and the discovery of the heroin. The evidence of the gun in Horton's case is as suppressible as the heroin in *Wong Sun*.

¶ 85     This reasoning accords with our discussion on Horton's fourth amendment interests. As we mentioned, Horton undoubtedly has an interest in his own bodily autonomy. He has thus, at all times, been free to challenge his arrest as unlawful. Evidence discovered as a result of an unlawful arrest, even if the arrest takes place in a location where the arrestee has no personal privacy interest, may still be suppressed if the discovery of the evidence is fruit of the unlawful arrest. *Kothe*, 152 S.W.3d at 61-62; *Eylicio-Montoya*, 70 F.3d at 1163. That is the precise situation presented here. We find that the gun should have been suppressed as fruit of Horton's unlawful arrest.

¶ 86                                     Conclusion

¶ 87     With the gun suppressed, the State would not be able to convict Horton on remand, and as a result, we reverse his conviction. *People v. Lopez*, 2018 IL App (1st) 153331, ¶ 38. Because we reverse Horton's conviction on this basis, we do not reach his remaining arguments.

¶ 88     Reversed.

¶ 89     JUSTICE PIERCE, dissenting:

¶ 90        The majority in this case originally reversed this conviction finding that the police officers could not lawfully arrest defendant for a gun offense premised on the statute found unconstitutional under *People v. Aguilar*, 2013 IL 122116. After our supreme court ruled in *People v. Holmes*, 2017 IL 120407, that the part of the AUUW statute found unconstitutional in *Aguilar* did not vitiate probable cause for a valid arrest, we were ordered to vacate the decision in *People v, Horton*, 2017 IL App (1st) 142019. *People v, Horton*, No. 122461 (Nov. 22, 2017). The majority again finds reasons to reverse Horton's conviction outright after being ordered to reconsider its decision in light of *Holmes*. I again respectfully dissent.

¶ 91        I disagree with the majority that the trial court erred in denying defendant's motion to quash and suppress. First, I take issue with the majority's cursory dismissal of the State's argument that Horton lacks standing to challenge the search and seizure because he did not have an expectation of privacy in the building where he was arrested.

¶ 92        It has gone undisputed that the defendant did not live in or have a possessory interest in the building he was arrested in, yet defendant argues that the officers had "no grounds to detain anyone at 6901 East End Avenue, to search under the mattress in bedroom of that residence, or to arrest Defendant." At no time did the defendant raise this issue in the trial court. The majority completely glosses over the State's argument in response that the trial court correctly denied defendant's motion to quash arrest and suppress evidence because defendant did not have a reasonable expectation of privacy in the house where he was found hiding and where the gun was recovered.

¶ 93        The majority misconstrues the law when it says that Illinois courts have done away with standing, "instead focusing on whether the defendant has a personal interest in the challenged police action." That is not the standard and it is certainly not the question we are called upon to

answer. The law is clear. "[T]he relevant inquiry is whether the person claiming the protections of the fourth amendment had a legitimate expectation of privacy in the place searched." *People v. Johnson*, 237 Ill. 2d 81, 90 (2010) (citing *People v. Sutherland*, 223 Ill. 2d 187, 230 (2006)).

¶ 94 Despite our duty to determine whether defendant had a legitimate expectation of privacy in the building, the majority skips the discussion about defendant's admitted lack of an expectation of privacy in the place searched calling it "irrelevant," and instead focuses on the fact that because defendant challenges the legality of his arrest, he may seek to suppress any evidence obtained as a result of the arrest when the arrest is unlawful. Notably, the majority ignores the issue. Defendant was arrested because, while defendant was on or near the street, Officer Hummons saw what appeared to be a gun in defendant's waistband. When the officer exited his car, Horton made eye contact and immediately fled into the row house and hid in a bedroom. After Officer Hummons entered the bedroom, Hummons believed defendant was concealing an item, which turned out to be the handgun that Hummons saw sticking out of defendant's waistband, which Hummons recovered from under the mattress next to where defendant was hiding.

¶ 95 Under Illinois law, "a warrantless and nonconsensual entry into a suspect's home to make an arrest is prohibited by the fourth amendment, even with probable cause." *People v. Wear*, 229 Ill. 2d 545, 567 (2008) (citing *Payton v. New York*, 445 U.S. 573, 586-87 (1980)). However, the person claiming the protections of the fourth amendment must establish that he or she had a legitimate expectation of privacy in the place searched. *Sutherland*, 223 Ill. 2d at 230. Factors relevant in determining whether a legitimate expectation of privacy exists include the individual's ownership or possessory interest in the property, prior use of the property, ability to control or exclude others' use of the property, and subjective expectation of privacy. *Id.* The defendant

challenging a search has the burden of establishing that he had a legitimate expectation of privacy in the searched property. *People v. Johnson*, 114 Ill. 2d 170, 191-92 (1986).

¶ 96    Defendant does not argue on appeal, and has never argued, that he had a legitimate expectation of privacy in the building where he was found hiding. There is nothing in the record to establish that he had any ownership or possessory interest in the residence. In fact, defendant admits that he "had no relation to the residence besides that he was there on the day he was arrested." Based on the record before us, we should affirm the ruling of the trial court on the only issue that was before it: that defendant had no legitimate expectation of privacy in 6901 East End Avenue, the place where he was arrested, and therefore, defendant had no legal basis to challenge the search of the premises where the weapon was recovered. The ruling of the circuit court in this respect should be affirmed.

¶ 97    Notwithstanding defendant's lack of standing, I disagree with the conclusions reached by the majority on the issues relevant to the trial court's finding of probable cause. The majority has no basis to characterize Officer Hummons' conduct as a "hunch." The record shows conclusively that reasonable, articulable facts, deemed credible by the trial court, were presented by the State in support of this arrest. First, the majority concludes that the record does not support a finding that Hummons could have reasonably believed that Horton was carrying a gun in his waistband. Second, the majority concludes that even if the record could support this finding, no evidence known at the time of the arrest supports a reasonable belief that Horton's possession of a gun was criminal. Third, because there was no reason to believe that Horton engaged in criminal behavior, his flight adds little to the analysis. Finally, the majority concludes that none of the officer's observations, once they entered the home, rose to the level of probable cause to believe Horton was committing a crime. I address each conclusion in turn.

¶ 98    Contrary to the majority's finding, the record does support a finding that Hummons reasonably believed that Horton was carrying a gun in his waistband and that he could make further inquiry. At the hearing on the motion to quash and suppress, Officer Hummons testified that he noticed a metallic object in defendant's waistband that he recognized as the butt of a handgun. On cross-examination, defense counsel asked Officer Hummons whether he recalled using the phrase "chrome metal object" when he referred to the item he saw in defendant's waistband. Officer Hummons said that he did use that term and answered affirmatively that he wasn't sure that he had seen a gun at that point. Further questioning by defense counsel clarified Officer Hummons earlier testimony. Defense counsel asked, "did you believe that you were just pursuing an individual who possessed a chrome metal object?" Officer Hummons replied, "[t]hat appeared to me to be a weapon" but acknowledged that he didn't include that part in his testimony at the preliminary hearing, although that observation and conclusion was clearly included in the police report. Officer Hummons went on to testify that he saw the butt of the "very shiny" chrome weapon. After describing the gun, Officer Hummons stated, "I can see chrome. I can see the majority of chrome in his waistband." Thus, a fair reading of Hummons' entire testimony shows that he saw an object in defendant's waistband that was a "metal object that he recognized as the butt of a handgun," "a chrome metal object," a "chrome metal object that appeared to [me] to be a weapon." None of these statements are inconsistent or inherently suspect or unworthy of credit and all are consistent with his police report. This testimony was accepted as credible by the trial judge, the only judge in a position to make that determination, and this finding warrants the deference it deserves and that we are required to give.

¶ 99    At trial, Officer Hummons testified that as he drove past defendant, defendant made eye contact with him. Officer Hummons then noticed a bulge in defendant's pants on his side near his

waist area. The bulge had the characteristics of a weapon. As defendant turned back to face the house, his shirt raised a little, and Officer Hummons got a "glimpse of a chrome metallic object." Officer Hummons, who had made hundreds of arrests for weapon offenses, testified that "[i]t appeared to me to be a weapon, the butt of a handgun." Defendant then ran into the house. Officer Hummons later observed defendant crouched down behind a bed and a chrome semiautomatic handgun was recovered from between the mattresses. The recovered weapon appeared to be the same weapon Hummons saw in defendant's waistband and from "the handle portion back," he could not see the trigger or the barrel of the gun; a portion of the handle was silver metallic and the rest of the handle was a dark color. Clearly, the totality of the circumstances establishes that it was reasonable for Officer Hummons to believe that defendant was carrying a gun in his waistband.

¶ 100    The majority's surgical dissection of the arresting officers' testimony at the preliminary hearing (based only on a question asked at the motion to suppress and not a transcript of the entire preliminary hearing), the motion to suppress and at trial does nothing to alter the correct ruling of the trial court on the motion to suppress evidence. The majority rests its entire analysis on what Officer Hummons allegedly did not say at the preliminary hearing. Importantly, Officer Hummons' preliminary hearing testimony is not part of the record on appeal so there is no intellectually honest way to evaluate or analyze all of Hummons' testimony at the preliminary hearing. Even the most inexperienced lawyer knows that testimony at a preliminary hearing lacks the detail that would typically be elicited at a jury trial. Defense counsel only used a snippet of Officer Hummons' preliminary hearing testimony in an attempt to impeach Officer Hummons. We do not know with certainty the entirety of his testimony at the preliminary hearing. What we do know is that at the hearing on the motion to quash and suppress, Officer Hummons clarified

that what he observed was the defendant with a chrome firearm in his waistband, what "appeared to me to be a weapon, the butt of a handgun" which was consistent with the police report that was created on the evening of defendant's arrest. There is no reasonable basis to reject this testimony on review.

¶ 101     Second, the evidence known to the officers at the time of the arrest supports a reasonable belief that Horton's possession of a gun was illegal and they had every right to continue to investigate. The majority mistakenly jumps right to a discussion about whether probable cause existed to arrest defendant without first considering the argument that Officer Hummons' initial attempted contact with defendant would have been a valid a *Terry* stop based on Hummons' observations. However, Hummons could not initiate a *Terry* stop because defendant fled, and *Wardlow*, 528 U.S. 119, instructs that flight is an important factor in the determination of probable cause. The underlying principles of *Terry* and its progeny, which cannot be ignored here, have evolved over 50 years resulting in an established body of law. A *Terry* stop is a type of police-citizen encounter which allows for a brief investigative detention, when supported by a reasonable, articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); 725 ILCS 5/107-4 (West 2010). "An officer may make an investigatory stop *** if he or she reasonably infers from the circumstances that an offense has been committed or is about to be committed." *People v. Henderson*, 266 Ill. App. 3d 882, 885 (1994). The question is whether the facts available to the officer warrant a person of reasonable caution to believe that the action which the officer took was appropriate. *People v. Houlihan*, 167 Ill. App. 3d 638, 642 (1988). An evaluation of a *Terry* stop necessarily entails balancing the need for the seizure against the invasion that the seizure entails. *Terry*, 392 U.S. at 21.

¶ 102    The facts of this case, found by the circuit court to be credible, showed that Officer Hummons was justified in attempting to effectuate a *Terry* stop. These credible facts showed that Officers Hummons and Meredith were on patrol traveling eastbound on 69th Street, when they saw defendant standing near the sidewalk in front of a row house. Officer Hummons saw a bulge at the right side of defendant's waist and, when defendant turned, his shirt lifted up and Officer Hummons could see a chrome metallic object. Officer Hummons, who had made hundreds of arrests for weapon offenses, testified that "[i]t appeared to me to be a weapon, the butt of a handgun." Officer Hummons told Officer Meredith to stop the car and back up. As Officer Hummons exited the vehicle, defendant ran into the row house. Officer Hummons chased him and entered the house. In the house, the officers found defendant hiding in a room and in constructive possession of a gun. There is no evidence that defendant had any possessory interest in the building and he affirmatively acknowledges on appeal that he had no interest in the building and no expectation of privacy. "Unprovoked flight in the face of a potential encounter with police may raise enough suspicion to justify the ensuing pursuit and investigatory stop." *People v. Thomas*, 198 Ill. 2d 103, 113 (2001).

¶ 103    In denying the motion to suppress, the circuit court found that "[C]ertainly based upon the totality of the circumstances, the fact that the officer believed he may have had a gun in his waistband and secondly, looking at the officer turning and running into the house, the officer certainly had reasonable grounds to believe that a crime may have been committed or is being committed at the time he made these observations and based upon the actions of the defendant," "he's got a right to investigate," "the defendant fled," "the officers' actions were reasonable." Further, the court found the officer was justified in entering the building because he was "in hot pursuit." We are obliged to accept these factual findings because they are not against the manifest

weight of the evidence (*People v. Absher*, 242 Ill. 2d 77, 82 (2011)) and the decision of the trial court is not clearly erroneous. *People v. Williams*, 161 Ill. 2d 1, 26 (1994).

¶ 104        The majority appears to be impressed that Hummons testified that he did not see defendant commit a crime. Clearly, in context, this singular answer relates to the time before Hummons saw the metallic, chrome object in defendant's waistband. Textbook foundational questioning at a motion to suppress calls for asking the officer whether a defendant was in violation of any city, state or federal ordinance or statute. This question usually precedes the development of testimony regarding whether the facts that were observed establish probable cause for an arrest and seizure. Also, to be clear, Hummons did *not* testify that he pursued defendant for a potential violation of any specific statutory offense. In almost 50 years of experience with criminal law, I have never encountered a police officer who testified to a specific statutory provision as the reason he made an initial street stop. Officer Hummons got out of his car because he reasonably believed, based on his experience that defendant was carrying what appeared to be a weapon and he did what we expect a police officer to do: he got out of the car to make a further inquiry. There are any number of weapon offenses that the officer is entitled to investigate. (See Appendix). It cannot reasonably be argued that the circuit court was in error in finding that an experienced police officer seeing a person in possession of what appeared to be a gun did not have a reasonable articulable suspicion of criminal activity that entitled him to make further inquiry. Under the facts of this case, at the very least, Officer Hummons could have initiated a valid *Terry* stop of defendant to inquire whether Horton was in violation of the law. *People v. Holmes*, 2015 IL App (1st) 141256; *People v. Thomas*, 2016 IL App (1st) 141040, ¶ 41. For example, it would not be unreasonable for the officer to inquire if Horton possessed a FOID card or whether he was a felon, *which he was*. However, and importantly, Officer Hummons did

not get the chance to make a reasonable inquiry because defendant, after making eye contact with the officer, ran into the row house as Officer Hummons exited his vehicle. Because of his flight there was no actual seizure of defendant on the street.

¶ 105    The majority next concludes that because there was no reason to believe that Horton was engaged in criminal behavior, his flight adds little to the analysis. I disagree because the Supreme Court specifically instructs that flight is a valid consideration in determining whether probable cause exists. *Wardlow*, 528 U.S. at 125. Here, defendant's flight is part of the ongoing series of events that form the totality of the circumstances necessary to determine whether probable cause existed.

¶ 106    The officer's pursuit of defendant under these circumstances was reasonable based on the principles established in *United States v. Santana*, 427 U.S. 38, 43 (1976) (defendant possessing contraband visible to public view set in motion police pursuit cannot defeat arrest by escaping into vestibule of home). Rather than confronting the defendant's flight in considering whether the officers were legally justified in pursuing the gun possessing defendant (*Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)), the majority first disavows injecting "any racial element" in this case and then volunteers an excuse for defendant's flight, announcing that it is "mindful of the reluctance of black men interacting with the police" and therefore the majority "cannot ignore the well-documented, reasonable and non-criminal impulse to avoid interactions with the police." *Supra* ¶ 7. In support of this conclusion, the majority cites to *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016), and a DOJ report on police brutality (not an issue in this case) to somehow negate the import of Horton's flight and to find it of no relevance to whether there was legal justification for Horton's ultimate seizure, arrest, prosecution and conviction.

¶ 107    The majority's reliance on, and discussion of, *Warren*, 58 N.E.3d 333, which is not binding on Illinois courts, serves no purpose other than to inject the topic of social injustice as justification for the majority's desired result. No issue of racial or social injustice was raised, much less intimated, by the defendant in the circuit court or on appeal. In point of fact, a complete, objective reading of *Warren* reveals that the *Warren* court did not instruct its trial judges to ignore flight as a consideration of the reasonable suspicion component of a valid *Terry* stop; rather, it reaffirmed that flight is a relevant factor that should be considered with caution in the context of a probable cause analysis.

¶ 108    The majority advises that it is in no way questioning the motivation of the officers in this case, and admits that "[t]he record does not support, and we do not find, any racial element to the interaction" (*supra* ¶ 7) but implies that Horton was targeted because of his race. The majority uses *Warren* and the DOJ report again in attempt to excuse defendant's flight stating, "one can readily understand why a young black man having a conversation with friends in a front yard would quickly move inside when seeing a police car back up." *Supra* ¶ 71. For that matter, one could readily understand why a twice-convicted felon who is carrying a loaded weapon would flee after making eye contact with a police officer who exits his car. The majority goes so far as to suggest that Horton's flight was a result of a "jump out squad," where officers "intentionally stop their cars and open the door to see if anyone runs; if they do, the officers give chase." *Supra* ¶ 70. There is no basis to inject these concepts into the review of this appeal.

¶ 109    The majority excuses Horton's flight by providing a plethora of excuses for his behavior. But why Horton took flight is not the question. Flight is important to the consideration of why the police did what they did and whether defendant's flight was factor that contributed to establishing probable cause. Here, I simply cannot ignore the fact that, from the officer's perspective, and the

finding of the trial court that this testimony was credible, the defendant had what appeared to be a gun in his waistband and that he decided to run from the police as soon as he made eye contact with them. "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Wardlow*, 528 U.S. at 125. An individual's refusal to cooperate with police, without more, does not amount to reasonable suspicion. *Id.* at 124-25. However, flight is a "consummate act of evasion" and is "just the opposite" of going about one's business. *Id.* Reasonable suspicion determinations must be made on common sense judgments and inferences about human behavior. *Id.* Had the majority confined its discussion to the issues raised by the defendant in his appeal and properly adhered to established Supreme Court and binding Illinois precedent, it would be compelled to find that the trial court was correct in finding that the officers had a reasonable articulable suspicion to approach Horton, and that his immediate flight was an important consideration in deciding the ultimate issues presented in his motion to suppress evidence: probable cause for his arrest.

¶ 110    I agree with the circuit court and the State that the totality of the circumstances supports a finding of reasonable suspicion. The trial court's conclusion, which is not against the manifest weight of the evidence and must be accepted, was that the defendant was seen standing near the sidewalk with what appeared to be a gun in his waistband. Defendant made eye contact with Officer Hummons. As Officer Hummons started exiting his vehicle, and before uttering a word, Horton ran from where he was standing near the sidewalk into the row house. Undoubtedly, defendant had a right to go about his business. However, by running into a building, defendant's evasive behavior was not simply a refusal to cooperate with the officers, it was a "consummate act of evasion" and "just the opposite" of going about one's business. *Id.*

¶ 111    Should a reasonable officer have ignored what he just saw? Common sense and human experience compels the conclusion that the last thing our citizens want is for police officers to shrug their shoulders and continue down the street when they see someone with a gun run away at the mere glance at a police officer, especially given the current level of violence in this city. There is nothing illegal or unreasonable about the police conduct in this case. Defendant's conduct does not defeat a finding that the officers had reasonable suspicion to justify their pursuit of the defendant. The officers were properly in the house and the recovery of the handgun from underneath the mattress was proper. Clearly, probable cause existed to arrest defendant. Finally, any implication that there is a temporal component to specifically knowing which law has been violated at the time of arrest must soundly be rejected. The totality of the circumstances provided the officers with probable cause to arrest the defendant for possession and to thereafter continue to investigate and charge, or not, defendant with any and all applicable criminal violations.

¶ 112    In conclusion, the officers had probable cause to arrest defendant. "A search incident to a valid arrest is proper if the search is conducted either contemporaneously or immediately prior to the arrest." *People v. Tillman*, 355 Ill. App. 3d 194, 200 (2005). And, "[s]earching a person or a place under a suspect's control, without a warrant, is lawful when the search is made subsequent to a lawful arrest and is conducted with the goal of locating other items connected to the crime." *Id.* The officers were properly in the house and the recovery of the handgun from underneath the mattress was proper. For the reasons above, I would affirm the trial court's denial of defendant's motion to quash arrest and suppress evidence

¶ 113    For the foregoing reasons, I would affirm defendant's conviction.

¶ 114                                APPENDIX

720 ILCS 5/24-1(a)(1)-(13) (West 2012) (requiring various nonpossessory elements such as presence in particular location, selling, manufacturing, intent to use against another, attaching a silencer).

720 ILCS 5/24-1.1 (West 2012) (requiring felon status).

720 ILCS 5/24-1.2 (West 2012) (requiring discharge of the firearm).

720 ILCS 5/24-1.2-5 (West 2012) (same).

720 ILCS 5/24-1.6(a)(1), (a)(3)(B)-(I) (West 2012) (imposing various licensing requirements and age requirements, disallowing possession while committing another misdemeanor, and disallowing possession while under an order of protection).

720 ILCS 5/24-1.7 (West 2012) (disallowing possession after being convicted of two or more qualifying felonies).

720 ILCS 5/24-1.8 (West 2012) (disallowing possession by street gang member).

720 ILCS 5/24-3.1(a)(1)-(6) (West 2012) (disallowing possession for citizens under certain ages, for citizens who are addicted to narcotics, for citizens who have recently been patients in mental hospital, and for those in possession of explosive bullets).

720 ILCS 5/24-3.6(b) (West 2012) (prohibiting possession of firearms in the shape of cell phones).

720 ILCS 5/24-3.8 (West 2012) (prohibiting possession of stolen firearm).

---

**No. 1-14-2019-B**

---

| | |
|---|---|
| **Cite as:** | *People v. Horton*, 2019 IL App (1st) 142019-B |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11-CR-14395; the Hon. Lawrence E. Flood, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Douglas H. Johnson, of Kathleen T. Zellner & Associates, P.C., of Downers Grove, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People. |

---