# Illinois Official Reports

## Appellate Court

---

### *In re D.L.*, 2018 IL App (1st) 171764

---

| | |
|---|---|
| Appellate Court Caption | *In re* D.L., a Minor (The People of the State of Illinois, Petitioner-Appellant, v. D.L., Respondent-Appellee). |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-1764 |
| Rehearing denied<br>Opinion filed | February 6, 2018<br>March 1, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-JD-663; the Hon. Cynthia Ramirez, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Sari London, and Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People.<br><br>Amy P. Campanelli, Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellee. |

Panel     JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion.


**OPINION**

¶ 1  Respondent, D.L., was charged in a petition for adjudication of wardship alleging that he committed various gun offenses. D.L. filed a motion to quash arrest and suppress evidence, alleging that the police had violated his right to be free from unreasonable searches and seizures under the federal and state constitutions. U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, § 6. After a hearing, the circuit court agreed with respondent and granted his motion to quash arrest and suppress evidence. In this court, the State contends that the circuit court erred in doing so.

¶ 2  The record shows that on March 29, 2017, the State filed a petition for adjudication of wardship under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2016)), alleging that 16-year-old respondent committed a Class 3 felony of defacing identification marks of a firearm (720 ILCS 5/24-5(b) (West 2016)), two Class 4 felonies of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1) (West 2016)), and a Class 4 felony of unlawful possession of a firearm (720 ILCS 5/24-3.1(a)(l) (West 2016)).

¶ 3  On April 24, 2017, respondent filed a motion to quash his arrest and suppress evidence, alleging that he was subjected to an unreasonable search and seizure. The circuit court held a hearing on respondent's suppression motion on April 26, 2017. The only witness to testify was Chicago police officer Bradley Scaduto.

¶ 4  Officer Scaduto testified that on the evening of March 28, 2017, he was working with three partners—Officers Borne, Riley, and Boubach—in an unmarked squad car. The officers were in plainclothes, wore "CPD badges" and had "police" on the back of their vests. Around 8:20 p.m., the officers received a dispatch concerning multiple calls of shots fired on "the 117th block of Loomis." The dispatch gave no information about the identity of the suspects or callers, other than "more than one person called in th[e] incident." Officer Scaduto and his partners, who were about "one minute away on Halsted Street," responded to the dispatch and began to drive toward the 117th block of South Loomis Street.

¶ 5  One minute later, while travelling westbound on 116th Street, the officers saw respondent and another male walking eastbound on the sidewalk about "two houses away from Loomis." Officer Scaduto did not know respondent, or see any bulges in his clothing. Officer Scaduto observed that respondent and the other male were "walking quickly" away from the area of the shots fired call. There were no other people on the street at the time, and Officer Scaduto observed respondent for approximately five seconds. Officer Scaduto stated that, "[d]ue to the fact that it was a shots fired call in that area and [respondent] was walking quickly away from that shots fired call, we attempted to conduct a street stop *** [to] have a conversation about the shot[s] fired call and if they heard anything."

¶ 6  The officers approached, and Officer Scaduto "told [respondent] to stop so we could have a conversation about the shots fired call." When asked whether this was "a request or *** an

order," Officer Scaduto clarified that "[i]t was an order." The male who was walking with respondent "complied" and headed toward the police car. Respondent, however, "did not comply with [Officer Scaduto's] order and began running" northbound down an alley. Officer Scaduto pursued respondent on foot, did not lose sight of him, and detained respondent less than one minute later. When asked what crime he was trying to apprehend respondent for, Officer Scaduto stated: "The shots fired call. The totality of the circumstances was [respondent] was leaving the area of the shots fired and then he didn't comply with my verbal commands where I told him to come to the squad car so we could have a brief conversation *** and then he fled in the alley."

¶ 7        Once he apprehended respondent, Officer Scaduto handcuffed respondent, "detained him[,] and placed him in custody." Officer Scaduto conducted a pat down because he had "reason to believe that [respondent] ran *** because he was concealing a firearm." Officer Scaduto denied that respondent was arrested at this point, stating that it was "part of the field interview."

¶ 8        During the pat down, Officer Scaduto recovered a .380-caliber semiautomatic handgun from inside the pocket of respondent's jacket. The handgun was "stove piped," meaning it had a malfunction that "only happens after you actually shoot the firearm." After he recovered the weapon, Officer Scaduto placed respondent under arrest.

¶ 9        Officer Scaduto explained that he performed a pat down "[b]ased on the totality of the circumstances, the shots fired call, the minor respondent walking away from the area of the shots fired call ***, and that he and another individual were the only ones on the street at the time of the shots fired call in that area." He further asserted that he had "reason to believe that he was concealing a firearm" based on the "shots fired call" and "that he fled from me and didn't obey *** my verbal commands."

¶ 10       Based on the above testimony, respondent argued that before Officer Scaduto had ordered him to stop, the officer had only observed him for five seconds, at which time he had been engaged in "normal behavior" by "walking away from a shooting scene." Respondent pointed out that Officer Scaduto did not observe any bulges or weapons and that there was no description, eyewitness, or informant connecting respondent to the shots fired. Respondent further argued that it was not enough to be in an area where criminal activity occurred and that flight from the police was not, standing alone, sufficient to establish probable cause.

¶ 11       In response, the State argued that the relevant time period was "the time the minor was actually seized and detained[,] not *** the time that the officer attempted to detain." Accordingly, the State contended that respondent was only seized after he fled from the officers, and at that time, "there was a valid *Terry* stop." *Terry v. Ohio*, 392 U.S. 1 (1968).

¶ 12       The circuit court granted respondent's motion to quash arrest and suppress evidence. It stated:

> "Even in the light most favorable to the State and even—everything that I've heard does not equal an appropriate *Terry* stop or an appropriate arrest.
>
> The officer testified that he received a call—numerous calls of shots fired and the only information that he had at his disposal at the time was the location. By his own admission, he had no description, no one had been interviewed, no one had been spoken to. He had no clue whether it was involving a woman, a man, black, white. We have

- 3 -

no description whatsoever. He doesn't know what he's looking for other than he's looking for an individual who shot a firearm.

We don't even [have] a description of what type of firearm; we have no description about the person that's involved. He indicates that the only observation he had at the time that he attempted the *Terry* stop, by his own testimony, was that the minor respondent was walking quickly away from an area where shots had been fired. That behavior alone, standing alone, is not abnormal. That behavior alone does not constitute criminal activity.

He stated that he did not observe a bulge on the minor; he did not observe the minor committing any crime. He simply observed him walking quickly away from an area where shots had been fired. He had no description; he had not interviewed anyone; he had no knowledge—basis of knowledge of what he was even looking for.

By his own testimony, he stated, specifically, that after he observed the minor respondent walking quickly away from the direction of the shots fired for a grand total of five seconds, he attempted to conduct a stop, were his first words. He was not attempting to conduct an interview; he was ready to stop the minor.

And that it was after the officer ordered him to stop and I stated, specifically, ordered him to stop, he was not making a request, he was not asking him, 'Hey, can I talk to you for a minute?' He was ordering him to stop; in essence, detaining him. He specifically stated, he was not free to not comply.

He did not observe the minor toss anything; he did not observe a bulge in the minor; he saw nothing more than the minor walking quickly for a grand total of five seconds.

That is not even in the officer's own words, 'the totality of the circumstances,' even remotely reasonable suspicion.

It's not probable cause; it's not reasonable suspicion; it's not even the totality of the circumstances. The only circumstance he had at his disposal at that time when he ordered him to stop was that the minor respondent was walking quickly away from where shots had been fired, which is perfectly normal for any individual to do.

He had no information about who had shot—who had fired the shots; he had not spoken to anyone; he had nothing more to go on than shots fired at a specific location.

And he certainly had nothing to go on when he ordered the minor to stop for a grand total of observation of five seconds of someone walking quickly away from the direction of shots fired.

So I find that the arrest is not proper and that the evidence that was obtained as a result of the arrest should be suppressed."

¶ 13 The State's motion to reconsider was denied after a hearing on June 16, 2017. The court "note[d] for the record that *Terry* must be justified from its inception of the contact" and reiterated its prior findings that "the only observation the officer had at the time was that the minor respondent was walking quickly from the shooting, which is not bizarre conduct at all." The court further found that respondent "was detained and placed under arrest prior to the officer conducting a pat-down" despite the officer "not having any indication whatsoever that the minor respondent had a firearm [or that he was] in any form or fashion involved in the shooting *** the officer was responding to." The court concluded that "the fact that two

individuals happen to be on the street where shots are fired, does not make them subject to give up their fundamental civil rights."

¶ 14     On July 14, 2017, the State filed a certificate of substantial impairment and a notice of appeal. In this court, the State contends that the circuit court's granting of respondent's motion to quash arrest and suppress evidence was erroneous because Officer Scaduto "conducted a lawful *Terry* stop and patdown [*sic*]." The State specifically contends that the totality of the circumstances supported a reasonable articulable suspicion that respondent "may have been involved in criminal activity" and a reasonable belief that respondent was armed and dangerous.

¶ 15     When reviewing a trial court's ruling on a motion to suppress, we accord great deference to the trial court's factual findings. *People v. Close*, 238 Ill. 2d 497, 504 (2010). We will reverse a trial court's findings of fact only if they are against the manifest weight of the evidence. *People v. Bunch*, 207 Ill. 2d 7, 13 (2003). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). However, we review *de novo* the trial court's ultimate legal ruling as to whether suppression of the handgun in this case was warranted. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004); *In re Mario T.*, 376 Ill. App. 3d 468, 472 (2007) ("Our focus *** is on the legal question of the justification of the stop and frisk so as to warrant the denial of the *** motion to suppress.").

¶ 16     When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion. *People v. Gipson*, 203 Ill. 2d 298, 306 (2003); 725 ILCS 5/114-12(b) (West 2016) ("The judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful shall be on the defendant."). A defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure, and, once a *prima facie* case is established, the burden shifts to the State to present evidence to counter the defendant's *prima facie* case. *Gipson*, 203 Ill. 2d at 306-07. However, the ultimate burden of proof remains with the defendant. *Id.*

¶ 17     The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "This provision applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *People v. Thomas*, 198 Ill. 2d 103, 108 (2001). Although "[r]easonableness under the fourth amendment generally requires a warrant supported by probable cause" (*id.*), the Supreme Court has recognized a limited exception to the probable cause requirement, allowing police officers, under appropriate circumstances, to briefly stop a person for temporary questioning where the officer reasonably believes that the person has committed or is about to commit a crime (*Terry*, 392 U.S. at 22).

¶ 18     Under the *Terry* exception, the police may conduct a brief investigatory stop "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The police officer "must be able to point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant that intrusion." *Thomas*, 198 Ill. 2d at 109. Determining whether a stop was reasonable is a two-step process in which we decide (1) whether the stop was justified at its inception and (2)

whether the scope of the stop was proportional to the circumstances that justified the interference in the first place. *People v. Croft*, 346 Ill. App. 3d 669, 675 (2004).

¶ 19    "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. [Citation.] The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity. [Citation.]" *Wardlow*, 528 U.S. at 123-24. The underlying facts are viewed "from the perspective of a reasonable officer at the time that the situation confronted him or her." *Thomas*, 198 Ill. 2d at 110.

¶ 20    In this case, the State argues that Officer Scaduto's intent at the time he ordered respondent to stop is irrelevant, because respondent was only "seized" for purposes of the fourth amendment when Officer Scaduto captured him after he fled down an alley. The State asserts that the officer was justified in stopping respondent at that point, describing the "totality of the circumstances" as "there were numerous calls of shots fired; *** respondent and his companion were walking quickly away from the crime scene of shots fired; *** no other people were in the area except for respondent and his companion; [and] *** the officers attempted to conduct a field interview but respondent turned around and fled."

¶ 21    In so arguing, the State seemingly concedes that Officer Scaduto lacked reasonable suspicion to conduct a *Terry* stop of respondent at the time that he initially ordered him to stop. We agree. At that time, the officer had observed respondent for five seconds as he was "walking quickly" on the sidewalk of 117th Street. Although the officer described respondent as walking "away from the area of the shots fired call," his testimony also established that respondent was not walking on either 116th Street or Loomis Street, the intersection where the shots were reported to have originated, and instead respondent was between one and two blocks away from that location. Nevertheless, as the trial court concluded, most people would be inclined to make a quick departure from the scene of gunfire, and accordingly, such behavior would not be unusual. Even Officer Scaduto implicitly acknowledged that he had no suspicion that respondent had engaged in criminal conduct at that time, since his claimed intent was to "have a conversation" with him about whether he had "heard anything" regarding the shots fired.

¶ 22    Moreover, the circumstances surrounding Officer Scaduto's order were clearly meant to exhibit a show of authority that would be indicative of a seizure. Specifically, Officer Scaduto and three other officers approached respondent, and Officer Scaduto used particular language when testifying, which indicated that he intended to convey to respondent that compliance with his request was mandatory. Officer Scaduto described his request as an "order" and a "command" and described respondent as failing to "obey" or "comply." See *People v. Luedemann*, 222 Ill. 2d 530, 553 (2006) ("factors that may be indicative of a seizure [include]: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

¶ 23    In such circumstances, we conclude that the stop of respondent was not justified from its inception. We find this case analogous to *People v. Moore*, 286 Ill. App. 3d 649, 651 (1997), in which this court considered a similar appeal of the granting of a motion to suppress evidence. In *Moore*, a police officer saw defendant next to a van parked in front of a tavern, which was known to be frequented by gang members and where narcotic activities and shootings had

- 6 -

occurred before. The officer saw what appeared to be an exchange of money between defendant and someone inside the van and began walking toward the vehicle. *Id.* at 650-51. Defendant began walking faster, and when the officer started chasing him, defendant ran and turned into an alleyway. *Id.* at 651. When defendant was apprehended and patted down, the officer found a bag of cocaine. *Id.*

¶ 24 In affirming the trial court's granting of defendant's motion to suppress, the court agreed with the trial court's conclusion that the officer lacked articulable facts to justify a *Terry* stop where the officer could not tell whether the money exchange he observed was part of a legal, or illegal, transaction. The court held that, "When a police officer approaches a person to make a *Terry* stop without sufficient articulable facts to warrant the stop, the officer's actions are not 'justified at the inception.' " *Id.* at 654. The court also found no probable cause to arrest defendant for violating the "resisting and obstructing" statute when he ran from police. *Id.* at 653. In so holding, the court quoted Professor LaFave:

> " 'The flight of a person from the presence of police is not standing alone sufficient to establish probable cause, unless of course the circumstances are such that the flight from the officer itself constitutes a crime. Were it otherwise, "anyone who does not desire to talk to the police and who either walks or runs away from them would always be subject to legal arrest," which can hardly "be countenanced under the Fourth and Fourteenth Amendments." ' " *Id.* at 654 (quoting 2 Wayne R. LaFave, Search and Seizure § 3.6(e), at 323-24 (3d ed. 1996)).

¶ 25 The State attempts to distinguish *Moore* by stating that in this case "there was nothing unlawful [about] Officer Scaduto seeking to talk to respondent and his companion about the reported shots fired in the area," citing *People v. Gherna*, 203 Ill. 2d 165, 178 (2003) for the proposition that "a seizure does not occur simply because a law enforcement officer approaches an individual and puts questions to that person if he or she is willing to listen." However, there is nothing in this case that would indicate that Officer Scaduto was seeking to have a voluntary interaction with respondent. To the contrary, as stated above, the testimony clearly showed that Officer Scaduto's actions conveyed a show of authority indicating that compliance with his order to stop was mandatory.

¶ 26 Nonetheless, we acknowledge the authority cited by the State, holding that a seizure does not actually occur until the person submits and that a person's flight from an unlawful stop may give rise to suspicion justifying a subsequent investigatory stop. See *Thomas*, 198 Ill. 2d at 112 (" 'The police may well convey a reasonable feeling of restraint, but that message does not amount to a seizure within the meaning of the fourth amendment until there is submission to it. A person must submit to a show of authority before that show of authority can constitute a seizure.' " (Emphasis omitted.) (quoting *People v. Thomas*, 315 Ill. App. 3d 849, 857 (2000))); *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that a seizure does not occur when there is a show of authority by an officer but the "subject does not yield").

¶ 27 The State argues, without supporting authority, that a "reasonable person innocent of a crime would *not* flee from the police" (emphasis in original). However, the United States and Illinois Supreme Courts have held otherwise. See *Wardlow*, 528 U.S. at 125 (Accepting as "undoubtedly true" that "there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity."); *Id.* at 129 (Stevens, J., concurring in part and dissenting in part, joined by Souter, Ginsburg, and Breyer, JJ.) (finding

that there are "unquestionably circumstances in which a person's flight is suspicious, and undeniably instances in which a person runs for entirely innocent reasons").

¶ 28    Even considering respondent's flight as part of the totality of the circumstances, we still conclude that Officer Scaduto lacked reasonable suspicion to conduct a *Terry* stop at the time that respondent was apprehended. Although "[u]nprovoked flight in the face of a potential encounter with police *may* raise enough suspicion to justify the ensuing pursuit and investigatory stop" (emphasis added) (*Thomas*, 198 Ill. 2d at 113), there is no bright-line rule authorizing the temporary detention of anyone who flees at the mere sight of the police (see *Wardlow*, 528 U.S. at 126 (Stevens, J., concurring in part and dissenting in part, joined by Souter, Ginsburg, and Breyer, JJ.)).To the contrary, it is well settled that flight alone is not sufficient to establish reasonable suspicion that a person has committed, or is about to commit, a crime. *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 32 (citing *People v. Harris*, 2011 IL App (1st) 103382, ¶ 12, and *Wardlow*, 528 U.S. at 124-25). It is only when that flight is coupled with other factors that it may support reasonable suspicion justifying a *Terry* stop.

¶ 29    In this case, the trial court found no other factors supporting a finding that Officer Scaduto had reasonable suspicion that respondent committed or was about to commit a crime. As discussed above, aside from his flight, there was no testimony showing that respondent was acting suspiciously in any way. In these circumstances, we conclude that respondent's flight alone did not justify the subsequent *Terry* stop. See *Harris*, 2011 IL App (1st) 103382, ¶ 15 (affirming the granting of the defendant's motion to suppress where the "only other evidence possibly justifying the stop was defendant's evasive conduct").

¶ 30    In so holding, we also reject the State's reliance on *Wardlow*, 528 U.S. 119. In *Wardlow*, the Supreme Court held that the defendant's unprovoked, "[h]eadlong flight" was one factor among several that, taken together, supported an officer's reasonable suspicion of criminal activity. *Id.* at 124. In particular, the Supreme Court noted that the officers saw defendant in an "area known for heavy narcotics trafficking," where the officers expected to encounter "drug customers" and "lookouts." *Id.* The officers saw the defendant standing next to a building holding an opaque bag, and upon looking in the direction of the officers, the defendant fled through a gangway and an alley. *Id.* at 121-22. The Supreme Court held that the above circumstances created a reasonable suspicion of criminal activity which justified a *Terry* stop. *Id.* at 124. Here, however, unlike in *Wardlow*, the trial court found no other factor supporting reasonable suspicion to justify a *Terry* stop when considering the totality of the circumstances. We do not find the trial court's conclusion on this point to be against the manifest weight of the evidence.

¶ 31    Having concluded that the police were not justified in temporarily detaining respondent, we must also conclude that the subsequent search was not justified. A police officer making a reasonable investigatory stop may conduct a protective search if he has reason to believe the suspect is armed and dangerous. *Adams v. Williams*, 407 U.S. 143, 146 (1972). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Id.* However, the right to perform a protective search presupposes the right to make the stop. The police may only perform a protective search if they are entitled to stop the person in the first place. See *id.* (police officer may perform a protective search "[s]o long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous"); *People v. Davis*, 352 Ill. App. 3d 576, 580 (2004) ("In order for a frisk to be constitutionally reasonable, (1) the stop must be proper, (2) the

officer must have reason to know that the defendant is armed and dangerous, and (3) the scope of the search must be strictly limited to a search for weapons.").

¶ 32    Since Officer Scaduto did not provide specific and articulable facts justifying the *Terry* stop, the protective search performed during that stop also lacked a sound constitutional basis. After giving the appropriate deference to the trial court's findings of fact, we cannot conclude that the trial court erred in granting respondent's motion to suppress.

¶ 33    In a petition for rehearing, the State raises generally the same arguments as it did during appellate briefing. The State contends that in finding no reasonable suspicion existed, this court "disregarded the other factors that elevated respondent's headlong flight into reasonable suspicion."

¶ 34    However, as we found previously, the factors that the State points to—specifically that the officers were investigating multiple calls of shots fired, and that respondent was found walking quickly away from the location where the shots allegedly originated—add very little, if anything, to our analysis. In fact, the United States Supreme Court has found that an officer lacked reasonable suspicion to conduct a *Terry* stop in a case that provided much stronger circumstances tying an individual to criminality. In *Florida v. J.L.*, 529 U.S. 266 (2000), police officers received an anonymous tip that a young black male, standing at a particular bus stop and wearing a plaid shirt, was carrying a gun. The officers arrived soon thereafter and saw the defendant, who matched the informant's description, standing at the bus stop. The officers conducted a *Terry* stop, and seized a gun from the defendant's pocket.

¶ 35    In the above circumstances, the Supreme Court determined that the anonymous tip lacked sufficient indicia of reliability to establish reasonable suspicion for a *Terry* stop. Like in *J.L.*, the officers in this case were responding to a tip regarding alleged criminal activity. However, in this case, there was no description given of the shooter or any other circumstances that would lead a reasonable officer to believe that respondent was the individual who fired the shots or was otherwise involved in the shooting. Respondent was found one-to-two blocks away from the location where the shots were allegedly fired, and he was not behaving suspiciously in any way by walking away from that scene. Having found nothing to support a reasonable belief that respondent was involved in the shooting, we conclude that his subsequent flight alone does not create reasonable suspicion to conduct a *Terry* stop.

¶ 36    Finally, we note that the State takes issue with our reliance on *Moore*, 286 Ill. App. 3d 649, arguing that it predated *Wardlow*, 528 U.S. 119, and *Thomas*, 198 Ill. 2d 103, and that its analysis is "questionable in light of" those cases. The State cites no authority, nor is this court aware of any authority, which would indicate that *Moore* is no longer good law in light of *Wardlow* or *Thomas*. To the contrary, *Moore* has been frequently cited with approval in the years following *Wardlow* and *Thomas*. See *People v. Shipp*, 2015 IL App (2d) 130587, ¶ 51; *People v. Slaymaker*, 2015 IL App (2d) 130528, ¶ 13; *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 15; *People v. Byrd*, 408 Ill. App. 3d 71, 78 (2011).

¶ 37    We find no conflict between *Moore*, *Wardlow*, and *Thomas*. These cases merely illustrate that this court must undergo a fact-based analysis of the totality of the circumstances when determining whether an officer has reasonable suspicion to conduct a *Terry* stop, even when the individual flees from the officer. As we stated previously, it is clear that these cases, read together, indicate that flight is an appropriate factor to consider in an analysis of the totality of the circumstances, but that flight alone is not enough. For the reasons stated above, we find this case to be distinguishable from *Thomas* and *Wardlow*, and more akin to *Moore*.

Accordingly, we find that Officer Scaduto lacked reasonable suspicion to conduct a *Terry* stop and that the circuit court properly granted respondent's motion to quash arrest and suppress evidence.

¶ 38     For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 39     Affirmed.