2020 IL App (1st) 170443
No. 1-17-0443
Opinion filed September 21, 2020

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 9426 |
| | ) | |
| TAHARI WILSON, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Joan Margaret O'Brien, |
| | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Walker and Justice Griffin concurred in the judgment and opinion.

**OPINION**

¶ 1     Tahari Wilson was arrested after running from police officers with a gun in his hand. Wilson's appointed counsel filed a motion to suppress evidence challenging his arrest on fourth amendment grounds. Later-retained counsel, however, without litigating the motion, proceeded to a bench trial. The trial court found Wilson guilty of unlawful use of a weapon by a felon and possession of a controlled substance (methylone). Wilson argues the State failed to prove him guilty beyond a reasonable doubt because the officers' testimony was "inconsistent and improbable." He also argues retained counsel was ineffective for failing to adopt and litigate

appointed counsel's motion to suppress evidence. We disagree with both arguments and affirm, though we correct Wilson's mittimus to reflect only the counts on which he was convicted.

¶ 2                              Background

¶ 3       Chicago police officers Martin McDonnell, Kevin Omara, and Matthew Kennedy were on patrol in an unmarked car near the intersection of 83rd Street and Loomis Boulevard. McDonnell drove, Kennedy sat in the front passenger seat, and Omara sat in the rear passenger side. At about 11:00 a.m., McDonnell saw Tahari Wilson walking south on the west side of Loomis from about 75 feet away. He had on a blue jacket and blue jeans.

¶ 4       Wilson "looked in [the officers'] direction" and immediately "turned [and] walked up to the front door" of the single-family home at 8250 S. Loomis. McDonnell watched as Wilson "quickly approached the door, knocked on the door, knocked on the window, attempted to open the front door, which was locked, [and] knocked on the door again." The time Wilson spent trying to get into the house was "[j]ust a couple seconds." McDonnell admitted Wilson was doing nothing illegal. Omara said Wilson did not run when he saw the officers, but they drove toward him anyway.

¶ 5       To get close to 8250 S. Loomis, McDonnell "pulled across the southbound lane of traffic [and] pull[ed] in front of the house." Wilson came down the stairs of the house while grabbing his right side. He ran north to the side of the house and then west down the gangway. McDonnell saw a gun in Wilson's right hand from about 20 feet away. Nothing was blocking his view. Though he viewed the gun for "seconds," he described it as a "silver and black semi-automatic *** handgun." McDonnell could see the "magazine and the front part of the frame as [Wilson] was running, and then as [Wilson] jumped the fence he used one hand to brace himself on the fence and the gun was

in his right hand." McDonnell blocked Omara's view, and Omara did not see the gun. After Kennedy got out of the car to chase Wilson, McDonnell drove Omara to the alley.

¶ 6    Omara entered the alley on foot and heard the sound of chain-link fences being hopped. He followed the sound to the unfenced yard of 8230 S. Loomis. He found Wilson there wearing a white shirt and blue jean shorts and arrested him. The time between Wilson's flight down the gangway and his arrest took two minutes "at the most." Omara patted Wilson down, finding "one small knotted baggie containing a round pill," which he sent to the crime lab for analysis. The parties stipulated that the contents of the Baggie contained 0.2 grams of methylone, an illegal substance.

¶ 7    Wilson did not have any weapons on him, but the officers went back to where the chase started and searched. In the yard of 8250 S. Loomis officers saw a gas grill with a vinyl cover "obviously askew" and "tampered with." Omara looked under the cover and found a loaded black and silver .45-caliber handgun. McDonnell identified it as the gun he had seen Wilson holding.

¶ 8    The State introduced a certified copy of Wilson's conviction for delivery of a controlled substance.

¶ 9    The Cook County public defender who originally represented Wilson filed a motion to suppress evidence arguing that Wilson's arrest was unlawful. The trial court continued the motion four times at the State's request because of the officers' absence from court. Then, before the motion was argued, Wilson hired private counsel. The State told Wilson's new counsel "[t]here was a motion on file." Retained counsel never argued the motion to suppress, and on the last status date before trial elected "to stand on [his] answer at this time without any other pretrial motions."

¶ 10 The trial court found Wilson guilty of one count of armed violence, one count each of unlawful use of a weapon by a felon (UUWF) for Wilson's possession of the gun and ammunition, and one count of possession of a controlled substance. After Wilson's counsel filed a motion to reconsider, the court vacated the armed violence conviction but denied the motion as to the UUWF and possession of a controlled substance counts. The court sentenced Wilson to 10 years on each of the UWWF counts and 3 years on the controlled substance count, to run concurrently.

¶ 11                                    Analysis

¶ 12 Wilson argues the evidence is insufficient to convict him, claiming the officers' testimony was "inconsistent and improbable." He attacks the sufficiency of the evidence of both his identity and his possession of a firearm. He focuses on four details: (i) Officer McDonnell's radio transmission about Wilson did not include information about a gun, (ii) Wilson was arrested without a gun on him and in different clothes than when officers first saw him, (iii) it is unlikely that Wilson would have ditched the gun under the grill cover but not the methylone pill, and (iv) McDonnell testified inconsistently about the distance from which he saw Wilson. These variations in testimony, viewed in the context of the entire record and in a light most favorable to the State, do not warrant reversal.

¶ 13 Wilson's challenge to the sufficiency of the evidence requires us to consider whether, viewed in a light most favorable to the prosecution, any rational trier of fact could have found him guilty beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). This standard gives "due consideration to the fact that the court *** saw and heard the witnesses." *Id.* At the same time, we give every case the effort, thought, and commitment necessary to assure a fair, informed, unbiased, and impartial decision. See *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000)

(appellate court not "mindless rubber stamp on every bench trial guilty verdict"). We must consider the record evidence carefully and reverse when it is insufficient. *Smith*, 185 Ill. 2d at 541; *Hernandez*, 312 Ill. App. 3d at 1037. Our careful review of the evidence shows it suffices.

¶ 14                    *Sufficiency of the Evidence: Wilson's Identity*

¶ 15    Wilson argues the officers' testimony was insufficient to establish his identity as the man they chased and arrested. Citing *People v. Cox*, 71 Ill. App. 3d 850 (1979), he argues for a factor test that we should apply because the eyewitnesses were police officers: (i) the continual and close pursuit of the suspect; (ii) consistent clothing worn by the suspect and person apprehended at the end of the chase; (iii) the location, timing, and foot traffic at or near the scene; and (iv) the proximity of the arrest to the scene of the crime or origin of the chase.

¶ 16    We find *Cox* inapplicable. In *Cox*, essentially, there was no identification at all. See *id.* at 855-56. The officer "could not distinguish [the suspect]'s facial characteristics," it was dark, there was scarce artificial lighting, and before the chase began, the officer's view of the suspects was obscured. *Id.* at 855. As a result, the court could not "say [the officer] made a positive identification." *Id.* The "factors" listed in *Cox* recite other circumstantial evidence that supported an otherwise nonexistent identification. Here, it was broad daylight, and before Wilson ran down the gangway, McDonnell had a direct view of his face from the front and side. Omara also had a direct view of Wilson's face, and his view was similarly unobstructed until Wilson ran down the gangway. We need not rely on the additional circumstantial evidence present in *Cox* because both McDonnell and Omara had direct views of Wilson.

¶ 17    Wilson also argues that the officers' testimony about their ability to see Wilson was unreliable. He claims McDonnell's radio transmission describing Wilson wearing a blue jacket

renders his identification unreliable because they found Wilson wearing a white T-shirt and "a white t-shirt and blue jeans are a common manner of dress." But the case Wilson cites in support involved an identification *based on* the defendant's clothing. See *People v. Moore*, 6 Ill. App. 3d 932, 936 (1972) ("no witness for the State, including the [victim], furnished any evidence concerning any physical feature of the defendant from which they could have identified him"). The description of Wilson's clothing was ancillary to his identification. *Moore* also applied the long-since rejected heightened standard of review this court used to apply to sexual assault cases, which made the State's burden much higher on appeal. *Id.* at 935 (noting "duty to examine the evidence in rape cases with great care"). This antiquated standard—rooted in the fallacious notion that female sexual assault victims often lie—no longer governs and makes *Moore* a poor precedent. See *People v. Schott*, 145 Ill. 2d 188, 202-03 (1991) (eliminating specialized standard of review).

¶ 18    Wilson also argues that Omara had an obstructed view of Wilson and so, even though he was the arresting officer, there was "an increased likelihood that Omara detained the wrong person." We disagree. This argument ignores Omara's testimony that he could see Wilson's face and that his view became obstructed after Wilson started running down the gangway.

¶ 19    Almost every case Wilson relies on to dispute his identification is from an era where two long-rejected standards applied to review of the sufficiency of the evidence in criminal cases. As we discussed, one category relies on the especially heavy burden Illinois courts previously placed on sexual assault victims. *Moore*, 6 Ill. App. 3d at 935. The second category comes from an era during which this court applied the bygone reasonable hypothesis of innocence standard. See *People v. Cullotta*, 32 Ill. 2d 502, 505 (1965) (citing *People v. Guardino*, 13 Ill. 2d 58 (1958) ("where the circumstances can be explained upon a reasonable hypothesis consistent with

innocence and leave a grave and serious doubt of guilt, a conviction cannot stand")). Applying the proper standard of review, we cannot say the discrepancies or deficiencies in the officers' testimony reach the severity to conclude that the State failed to prove him guilty beyond a reasonable doubt.

¶ 20                                  *Sufficiency of the Evidence: The Gun*

¶ 21    Wilson also contends the State failed to prove he possessed a firearm. We start with his suggestion that the State's evidence did not show that the object McDonnell observed met the statutory definition of a firearm. See 430 ILCS 65/1.1 (West 2014). Our resolution follows our supreme court's recent decision in *People v. McLaurin*, 2020 IL 124563. There, an officer saw the defendant, from about 50 feet away, leave a building " 'carrying a silver handgun.' " *Id.* ¶ 4. After the defendant was arrested, the officer identified a recovered handgun as the one she saw the defendant holding, referring to its color and size. *Id.* ¶ 34.

¶ 22    McDonnell's testimony is stronger than the officer's testimony in *McLaurin*. McDonnell explained that the gun he saw was a "silver and black semi-automatic *** handgun." From his vantage point from 20 feet away, he could see the "magazine and the front part of the frame." McDonnell could see that Wilson held the gun "by the grip." After Omara found a gun under the grill cover, McDonnell identified it as the same silver and black semiautomatic handgun that he saw Wilson holding. We have questioned the wisdom of allowing a single eyewitness's testimony to provide proof of a technical element of an offense (see *People v. Clifton*, 2019 IL App (1st) 151967, ¶¶ 45-47), but according to *McLaurin*, McDonnell's testimony is enough to prove the gun he saw Wilson holding met the statutory definition of a firearm.

¶ 23    Wilson also challenges the believability of McDonnell's testimony that he saw Wilson with a gun. He argues it "taxes the gullibility of the credulous" (see *People v. Wright*, 147 Ill. App. 3d 302, 318 (1986)) to believe that McDonnell would see a gun and fail to include that information in a radio transmission to fellow officers. We note first that the officer in *McLaurin* also called for backup and nothing indicated she included information about a gun she observed. *McLaurin*, 2020 IL 124563, ¶ 4. Here, the record is unambiguous about the content of McDonnell's dispatch; it is ambiguous as to its timing. We know McDonnell first saw the gun sometime after Wilson ran down the gangway. We know he sent out a radio call sometime after Wilson started running and before the pursuit began. And we know the pursuit did not begin until Wilson made it over the fence in the yard of 8250 S. Loomis. The dispatch could have been sent any time after Wilson got down from the porch and before he hopped the fence. This span of time includes at least a brief period when Wilson ran through the front yard at 8250 S. Loomis. Viewing this evidence in the light most favorable to the State, McDonnell could have sent the broadcast before he saw the gun. Applying the appropriate standard of review, we find the evidence sufficient to prove Wilson possessed a gun.

¶ 24                        Ineffective Assistance of Counsel

¶ 25    Wilson next argues that retained counsel was ineffective for failing to litigate the motion to suppress evidence that appointed counsel had originally filed. He argues the motion to suppress would have been granted because "officers observ[ing] him flee while possibly possessing a handgun" does not create probable cause for an arrest. We agree that flight alone does not provide probable cause for an arrest; we also agree that possession of a gun alone does not provide probable cause for an arrest. Headlong flight while openly carrying a firearm, however, inches the officers'

suspicion across the line of probable cause. Because there was probable cause to arrest, we find a motion to suppress would not have been meritorious, and Wilson suffered no prejudice from retained counsel's decision not to adopt appointed counsel's motion.

¶ 26    We evaluate claims of ineffective assistance of counsel under the familiar standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Utley*, 2019 IL App (1st) 152112, ¶ 36. To demonstrate ineffective assistance, a defendant must show (i) counsel's performance was deficient and (ii) counsel's purported deficiency prejudiced the defendant. *Id.* To establish prejudice in the context of ineffectiveness claims for failing to file a motion, a defendant must show both that (i) the unargued motion was meritorious and (ii) a reasonable probability the outcome of trial would have been different. *People v. Henderson*, 2013 IL 114040, ¶ 15. We review claims of ineffective assistance of counsel *de novo*. *Utley*, 2019 IL App (1st) 152112, ¶ 37.

¶ 27    Wilson's failure to demonstrate his motion to suppress would have been meritorious dooms his ineffective assistance claim. Both the United States and Illinois Constitutions protect against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The parties agree that Wilson's detention was an arrest requiring probable cause. An officer has probable cause "when facts exist that would lead a reasonable person standing in the shoes of the police officers to conclude that a crime has been committed and the defendant was the person who committed [it]." (Internal quotation marks omitted.) *People v. Jackson*, 391 Ill. App. 3d 11, 36 (2009). Probable cause to arrest requires more than mere suspicion, and we are guided by "practical, commonsense considerations" based on an assessment of "probabilities in particular factual contexts." (Internal quotation marks omitted.) *Id.* Considering the totality of the circumstances, we cannot say the officers lacked probable cause to arrest Wilson.

¶ 28    Wilson argues, and we agree, that "flight from police alone does not amount to probable cause to arrest." This court has held that flight—even when it occurs near the scene of a recently committed crime—does not establish reasonable suspicion of criminal activity, let alone probable cause. *In re D.L.*, 2018 IL App (1st) 171764, ¶¶ 4-6, 28. Wilson also argues, and we agree, that mere possession of a gun is not enough to establish probable cause that a crime has been or is being committed. See *People v. Thomas*, 2019 IL App (1st) 162791, ¶ 23 (after Illinois Supreme Court decided *People v. Aguilar*, 2013 IL 112116, "the police needed probable cause to believe, not only that defendant possessed a gun, but that his possession was illegal"). Throughout his brief, however, Wilson resists the implications that arise from a suspect's flight *while* openly carrying a gun.

¶ 29    We start with Wilson's open carry of the gun. For an observation of the open carry on private property to amount to probable cause, the officers must have reason to believe the suspect is not the owner of the property or invitee on the property with permission of the owner. See *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 59; see also 720 ILCS 5/24-1(a)(10)(iv) (West 2016) (requiring concealed carry permit only when person is not "on his [or her] land or in his [or her] own abode *** or on the land or in the legal dwelling of another person as an invitee with that person's permission"). We reject the State's implication that Wilson's "frantic attempt to get into a locked home" supported probable cause to believe he unlawfully possessed the gun at 8250 S. Loomis. McDonnell testified that Wilson "walked up to the front door," where he knocked, then knocked on the window, then tried the door, then knocked again. Omara also testified that Wilson "walk[ed] up to a door and started knocking on the door." Nothing in the record supports the State's characterization of Wilson's behavior as "frantic."

¶ 30   More to the point, the officers testified that that they did not see Wilson do anything illegal when they first saw him. Without some explanation of why the officers may have thought Wilson's attempts to be let into the house were evidence of criminal activity, we will not draw the inference ourselves. Wilson's behavior is no different than any person who has locked themselves out of their home or who wants the owner to let them in. We also will not draw an inference of suspicion just because Wilson's attempt to get inside the house may have been responsive to police presence. See *Horton*, 2019 IL App (1st) 142019-B, ¶¶ 69-71 (discussing "eminently reasonable and noncriminal reason[s]" someone would want to avoid interaction with police and do so quickly). Wilson undoubtedly tried to get someone to let him in to the house, but without more that is far from evidence of *criminal* activity. *Id.* ¶ 54 (to support probable cause, officers must reasonably believe defendant committed or is committing a crime).

¶ 31   Because the record is silent on whether Wilson was the owner of or invitee at 8250 S. Loomis, we do not agree with the State's argument that his open carry of the gun on that property was evidence that he violated the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2014)).

¶ 32   That is not, however, the end of the inquiry. McDonnell saw Wilson, while carrying the gun, jump over the fence to get into the backyard of 8250 S. Loomis. Omara followed the sound of Wilson jumping over fences through other yards. These observations could lead to a reasonable belief that Wilson was openly carrying a firearm across multiple properties and that, therefore, a crime was being committed. *Horton*, 2019 IL App (1st) 142019-B, ¶ 54 (reciting standard). We find it important to reiterate, once again, that Wilson's flight without observations of open carry

would not have been enough information to support probable cause. *D.L.*, 2017 IL App (1st) 171764, ¶ 28.

¶ 33    We conclude by noting two aspects of this interaction that are particularly troubling. Just as flight without observation of the gun would not have been enough for probable cause, neither would Wilson's open carry on private property without flight have been enough for probable cause. The Illinois Supreme Court's decisions recognizing second amendment protection to gun possession outside the home (*People v. Burns*, 2015 IL 117387; *Aguilar*, 2013 IL 112116) drastically altered the fourth amendment landscape. Suspicion and presumption of illegality are no longer the default for officer observation of gun possession on private property. See *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) (illegal possession of firearm in states permitting carry of firearms not "default status"). Were it any other way, officers would have "unchecked police discretion to single out anyone carrying a gun *** based on neighborhood, class, *** or ethnicity." (Internal quotation marks omitted.) *United States v. Robinson*, 846 F.3d 694, 712 (4th Cir. 2017) (Harris, J., dissenting) (citing *United States v. Williams*, 731 F.3d 678, 694 (7th Cir. 2013) (Hamilton, J., concurring in part and concurring in the judgment), and *Utah v. Streiff*, 579 U.S. ___, ___, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting)).

¶ 34    In a similar vein, we are troubled by the officers' decision to initiate their encounter with Wilson in the first place. Officers, we acknowledge, need no suspicion to have a consensual encounter with someone. *People v. Luedemann*, 222 Ill. 2d 530, 549 (2006). Omara, however, testified that they observed Wilson doing nothing illegal and, though some testimony indicated there had recently been violent crime in the area, no officer suggested that Wilson was a suspect. Officers engaging in behavior to purposefully induce flight in the hopes of catching someone

responding "suspiciously" is a practice that damages community trust and places police and the public in unnecessary danger. See *Horton*, 2019 IL App (1st) 142019-B, ¶¶ 68-70. What the officers did here may have been legal, but it was not right.

¶ 35    The law instructs us to evaluate probable cause in light of the totality of the circumstances. *People v. Gocmen*, 2018 IL 122388, ¶ 19. It is only the confluence of facts—Wilson's flight through multiple properties after officers saw him openly carrying a firearm—that rises to probable cause when considered together. None of those facts would be sufficiently suspicious on its own. We conclude based on the governing law that enough information was known to the officers to support Wilson's arrest.

¶ 36    Because the officers had probable cause to arrest Wilson, his motion to suppress evidence would have been denied. As a result, he cannot have been prejudiced by retained counsel's failure to litigate appointed counsel's motion to suppress and his claim of ineffective assistance of counsel necessarily fails. *Henderson*, 2013 IL 114040, ¶ 51 ("Because a motion to suppress *** would not have been granted, defendant cannot satisfy his burden under *Strickland*.").

¶ 37                          Correction of Sentencing Order

¶ 38    Wilson argues, and the State agrees, we should correct Wilson's mittimus to reflect only the offenses of which he was convicted. The sentencing order reflects convictions for two counts of unlawful use of a weapon by a felon (counts II and III), two counts of aggravated unlawful use of a weapon (counts IV and V), and one count of possession of a controlled substance (count VI). Before trial the State moved to nol-pros counts IV and V, and the trial court made an oral finding of guilt on counts I through III and VI. We order the trial court to amend Wilson's mittimus to remove count IV and count V.

¶ 39     Judgment affirmed; mittimus corrected.

| | |
|---|---|
| **Cite as:** | *People v. Wilson*, 2020 IL App (1st) 170443 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-9426; the Hon. Joan Margaret O'Brien, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mari R. Hatzenbuehler, and Erika Gilliam-Booker, Assistant State's Attorneys, of counsel), for the People. |