2024 IL App (2d) 230461-U
No. 2-23-0461
Order filed August 26, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-1891 |
| ALEXANDER M. SANCHEZ, | ) ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Birkett and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's *in limine* order barred admission of defendant's mother's statements to defendant as recorded on the family's inside and outside home surveillance cameras at the time of the incident. Because the order covered only the mother's *video-recorded statements* to defendant outside and inside the home, not her *testimony* about what she said to defendant outside and inside the home, (1) trial counsel cannot be said to have opened the door to the mother's testimony about what she said to defendant inside the home, (2) the trial court did not err in allowing the mother to testify about what she said to defendant outside the home, and (3) posttrial counsel was not ineffective for failing to allege either trial counsel's ineffectiveness or the trial court's error.

¶ 2    Defendant, Alexander M. Sanchez, was charged with various offenses related to a physical fight he had with his stepfather, Fred Linares, outside the family's home. Before trial, the State

filed a motion *in limine*, seeking to admit at trial recordings from Nest surveillance cameras inside and outside the house. The State claimed, as relevant here, that statements defendant's mother, Eunice Zavala, made on the inside and outside recordings were hearsay but admissible under the excited utterance exception. See Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). The trial court denied the motion *in limine* as to any statements Zavala made on the recordings. Specifically, the court found, among other things, that (1) Zavala's statements made on the inside recording were not excited utterances and (2) the outside recording was indiscernible and, to the extent Zavala could be heard, her statements were not excited utterances. At the bench trial, Zavala testified to what she told defendant during and right after his fight with Linares, which statements might have been included in the recordings.[1] Defendant was convicted of one count of aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2020)), two counts of domestic battery (*id.* § 12-3.2(a)(1), (a)(2)), and one count of aggravated domestic battery (*id.* § 12-3.3(a)). He was sentenced to 180 days in jail, 48 months of intensive probation, and 250 hours of public service. Defendant timely appeals, arguing that (1) his trial counsel was ineffective for opening the door for the State to ask Zavala about what she said to defendant inside the family's home on the night of the incident and (2) his posttrial counsel was ineffective for failing to raise in posttrial proceedings (a) trial counsel's ineffectiveness and (b) the trial court's error in allowing Zavala to testify about what she said to defendant outside the home on the night of the incident. We affirm.

¶ 3                             I. BACKGROUND

---

[1]The outside recording is not included in the record on appeal, and only clips of the inside recording are included.

¶ 4 The State filed a motion *in limine* titled "People's Motion *In Limine* #3: Admission of 'Nest' Video Recording [*sic*]." The State sought to admit video recordings from the night of the fight between defendant and Linares. The family's Nest surveillance cameras situated inside and outside the home made the recordings. The Stated noted that defendant, Zavala, and Linares made statements on the recordings. After addressing foundation for admission of the recordings, the State argued that Zavala's statements, although hearsay, were admissible as excited utterances given the startling nature of the fight. See Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). The State generally described what Zavala said on the recording made inside the home but did not describe what she said on the recording made outside the home. The State then summarized that, "[b]ased on the nature of the recordings, the audio portions do not offend the defendant's constitutional rights and are property [*sic*] admissible as falling within application [*sic*] exceptions to the hearsay rule." The State's prayer for relief "ask[ed] leave of [the] Honorable Court [to] conduct a hearing on the [State's] Motion *[I]n Limine* for admission of the [N]est surveillance video [*sic*]."

¶ 5 After a hearing, the trial court entered a written order providing that "People's Motion *In Limine* #3 is denied as to any statements of [Zavala] as an excited utterance[.]" In orally ruling, the court stated:

> "Well, I don't believe that [Zavala's] statements can qualify as an [*sic*] excited utterance. And they go into the house. And as [trial counsel] said, there are some plans being made. It's not just an immediate reaction to what is occurring or what had occurred. However, those statements could be used in cross-examination and to impeach her, and so they will not be used as excited utterance[s].

Now, with regard to the defendant's statements, those may come in and [we] may have to look at that tape and determine it's only the defendant's statements that can come in.

The defendant's talking on the phone to his [biological] father as you indicated and talking about him going to be arrested or going to jail, those will not be allowed in.

Now, with regard to the exterior, there is really nothing that the Court can see. And if the Court can hear statements made by [Zavala], I won't allow that in. If it's statements made by the defendant, that may be relevant. It could also be relevant in terms of the time, the length of time that that event occurred and the time that they went into the house. That may be relevant. And so you can look at that, and maybe you can—both the Defense and the State look at that and come to some agreement as to the timing on it. But other than that, I don't think it's relevant."

¶ 6    Evidence presented at defendant's trial revealed that, from 1 to 4 p.m. on November 12, 2022, defendant, Linares, and Zavala helped a neighbor decorate for a quinceanera. When they finished, they went home and dressed for the party. Linares clipped one of his knives, a pocketknife, to his belt.

¶ 7    The family stayed at the party until approximately 10:30 or 10:45 p.m. Linares testified that he did not want to leave that early. On the way home, he asked Zavala why they left. She replied that they left because he was flirting with a younger woman and drinking excessively. When defendant inserted himself in the discussion, Linares ordered Zavala to tell defendant to "stay out of our marriage." Defendant and Linares started arguing.

¶ 8    The family arrived home at 10:50 p.m. and parked their car in the driveway. The home's lights were off, and it was quite dark outside, with the moonlight providing the only illumination.

Linares went to the back of the car and started unloading supplies the family had taken to the quinceanera. One of those items was a hairdryer. The argument between Linares and defendant became more heated, with both men yelling at each other.

¶ 9    Linares decided he had had enough, so he turned away from defendant. At that point, defendant hit Linares on the back of the head with a reusable water bottle. The bottle broke in two.

¶ 10    Linares stumbled after being hit with the water bottle, and the fight continued. Linares testified that Zavala was "yelling to [the men] to stop[,]" and defendant testified that Zavala "scream[ed]," "Stop, Sanchez."

¶ 11    According to Linares, defendant pulled Linares's hoodie over his head, and, in the process, Linares's arm got stuck in the hoodie sleeve. Linares then "felt like [defendant] was punching [him] or something." Linares, who had lost his eyeglasses during the fight, grabbed the hairdryer and hit defendant with it. The fighting continued down the driveway, along a chain link fence. Linares pushed defendant, and defendant fell. Linares retrieved his cell phone from his pocket and called 911. Linares, who did not realize that he had been stabbed, told the 911 dispatcher that defendant had punched him. Defendant and Zavala went inside the house at 10:54 p.m.

¶ 12    The police arrived at the family's home at 11 p.m. Round Lake Beach police officers Edward Torres and Tim Zornow were two officers at the scene. They saw Linares bleeding profusely from his abdomen. Linares lifted his hoodie, revealing several large lacerations on his abdomen.

¶ 13    Zornow knocked on the door to the family's home, and Zavala came outside. Approximately two minutes later, defendant exited the house. Defendant had drops of blood on

his pants, shirt, and shoes. The blood on defendant's shirt was concentrated around his stomach area. Defendant denied that the blood was his. He appeared to be uninjured.

¶ 14     The police asked defendant, who was respectful and cooperative, if he had any weapons on him. Defendant said he might have a box cutter that he used for his job at Home Depot. The police did not find a box cutter on defendant. However, the police found one in defendant's room. The blade was open. Pictures of the box cutter admitted at trial showed small reddish-brown stains on the blade. No DNA testing was done on the box cutter.

¶ 15     Linares was transported to a hospital where he was treated for his life-threatening injuries. His pocketknife was closed and still clipped to his belt.

¶ 16     Defendant testified that he hit Linares with the water bottle because Linares charged at him. On the night of the incident, he had a box cutter in his pocket from his job at Home Depot. However, he denied using or holding the box cutter or any sharp weapon during the fight. Defendant also denied cleaning the box cutter before the police arrived.

¶ 17     Zavala testified that she witnessed the argument between defendant and Linares evolve into a fight. They "grabbed onto each other, and they went back and forth." Zavala was "very concerned about what [she] [was] seeing," and she "scream[ed] like a wild banshee[,]" trying to stop the fight and get her neighbors' attention. She did not witness anyone get cut during the fight. She acknowledged that she "wouldn't want anything bad to happen to [her] son," but she added that she "wouldn't want anything bad to happen to anybody." When the fight was over, she and defendant went inside the house. Trial counsel then asked her, "And did you say anything to [defendant] regarding the fight itself?" The State objected on hearsay grounds. The trial court overruled the objection, asserting that "[Zavala] can testify to what she said, not to what [defendant] said in response." Zavala testified that because she had not assessed the situation fully,

she advised defendant not to say anything and to call his biological father to discuss obtaining a lawyer, which she believed Linares would also need.

¶ 18    On cross-examination, the State inquired further about what Zavala said to defendant inside the house. For example, the State asked, "And you were telling [defendant] what to do and what to say when the police arrived?" Zavala responded, "Correct." The State asked, "You also told [defendant] that he hit [Linares] first, right?" Zavala replied, "Correct, because that's what I thought at the time." Because she believed then that defendant started the physical fight, she accused him of "not telling the truth" and told him to "stop lying." She also told him to "unplug the Nest camera." Trial counsel never objected to any of this testimony.

¶ 19    The State also asked Zavala on cross-examination about what happened outside the home. That colloquy was as follows:

> "Q. Okay. Now, you're aware that there is a—that there's a Nest camera outside?
>
> A. Correct.
>
> Q. Correct? And would you be surprised to learn on this Nest camera you can hear this scuffle?
>
> A. Yes.
>
> Q. Okay. You can also hear your voice saying: Stop it, Sanchez.
>
> MR. BRZEZINSKI [(DEFENSE COUNSEL)]: Objection, Your Honor.
>
> THE COURT: Overruled.
>
> MS. WANZENBERG [(ASSISTANT STATE'S ATTORNEY)]: You said: Stop it, Sanchez.
>
> A. Yes."

On redirect, Zavala clarified that she "yell[ed]" at defendant to stop "[b]ecause he was the only one [she] could control. [She] can't control [Linares]. He has rage."

¶ 20    The video recording made outside the home was not admitted at trial. However, clips of the video recording made inside the home were admitted. Those clips concerned substantive statements defendant made about the incident. Although Zavala was heard in some of these clips, the trial court reaffirmed that it "will not consider anything that [Zavala] may have said." The court assured the parties that "[it] can put *** aside, not consider anything that [Zavala] said and only listen to and consider what the defendant said."

¶ 21    The emergency room physician who treated Linares described the various wounds to Linares's torso, left thigh, and his right hand between the fingers. The physician testified that the wounds appeared to be caused by a knife-like object with a sharp cutting edge. He further opined that the injuries to Linares's right hand were defensive wounds and that none of his injuries were self-inflicted or caused by falling into a bush or chain link fence.

¶ 22    In closing argument, trial counsel argued that the State failed to prove how Linares's wounds were caused. Trial counsel relied partly on Zavala's testimony that she did not observe anyone get cut during the fight.

¶ 23    In rendering its judgment, the trial court reviewed the witnesses' testimony. The court found that Zavala was "not an independent witness because she specifically said she would not ever want anything to happen to her husband, who was the victim, or to her son, and she says she didn't see anything." The court also observed that Zavala yelled, "Sanchez, stop" during the fight. In finding defendant guilty, the court stated:

> "So based on all of the testimony—and what specifically the [c]ourt looks at is the actual injuries, and they are absolutely consistent with the testimony of [Linares]. So based

on looking at the credibility of all the witnesses; the injuries being consistent, as I indicated, with when [Linares] said his hood[ie] was pulled over and his arms were raised, there is a cut between the second and third finger of his hand—of his right hand which *** [was] described as likely defensive as well as on his arm, and that there were stab wounds or slashes to his left side as well as to the left upper thigh—so based on all the testimony and the [c]ourt's assessment of the credibility of the witnesses, I find the defendant guilty of [one count of] aggravated domestic battery; [one count of] aggravated battery; and [two counts] of domestic battery."

¶ 24 Afterwards, trial counsel withdrew and defendant retained new counsel for posttrial proceedings. Counsel filed a posttrial motion, which alleged that trial counsel was ineffective in several respects and asked the trial court to reconsider its finding of guilt. The motion raised no issue regarding the *in limine* order on the video recordings. In rejecting the challenge to its finding of guilt, the trial court noted that it "could not find [Zavala's] testimony credible based on the fact that she wanted and testified she wanted to help her son."

¶ 25 Defendant was sentenced, and this timely appeal followed.

¶ 26 II. ANALYSIS

¶ 27 On appeal, defendant argues that (1) trial counsel was ineffective for opening the door for the State to ask Zavala what she said to defendant inside the family's home on the night of the incident and (2) posttrial counsel was ineffective for failing to raise in posttrial proceedings (a) trial counsel's ineffectiveness and (b) the trial court's error in allowing Zavala to testify about statements she made outside the home on the night of the incident.

¶ 28 Every defendant has a constitutional right to the effective assistance of counsel under the United States and Illinois Constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I,

§ 8. The *Strickland* standard governs claims of ineffective assistance. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. More specifically, the defendant must show that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The defendant's failure to establish either prong of the test warrants a finding that counsel was not ineffective. See *People v. Boots*, 2022 IL App (2d) 200640, ¶ 35 ("A defendant must satisfy both prongs of the *Strickland* test to prevail, and the failure to establish either prong precludes a finding of ineffective assistance of counsel."). We review *de novo* whether counsel was ineffective. *People v. Wilson*, 2020 IL App (1st) 170443, ¶ 26. With these principles in mind, we consider whether trial counsel and posttrial counsel were, as defendant claims, ineffective.

¶ 29                                A. Trial Counsel

¶ 30    Before considering trial counsel's alleged ineffectiveness, we address the State's claim that defendant has forfeited review of the issue because he did not raise it in his posttrial motion. See *People v. Belknap*, 2014 IL 117094, ¶ 66 ("To preserve an alleged error for review, a defendant must both make an objection at trial and include the issue in a posttrial motion."). We disagree. Because defendant has argued that posttrial counsel was ineffective for failing to raise trial counsel's ineffectiveness, the issue is not forfeited. See *People v. Miller*, 2014 IL App (2d) 120873, ¶ 16.

¶ 31 Defendant argues that trial counsel was ineffective because, given that clips from the inside recording were admitted, trial counsel had no reason to question Zavala about what she told defendant inside the house. Defendant claims that trial counsel's "line of questioning opened the door for the State to further inquire about Zavala's statements," which were inadmissible hearsay as determined in the trial court's *in limine* order. See *People v. Harris*, 231 Ill. 2d 582, 588 (2008) ("There is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible."). Defendant contends that trial counsel performed deficiently, as "[n]o sound trial strategy justifie[d] the admission of this hearsay evidence." Defendant then argues that he was prejudiced by trial counsel's deficient performance because "Zavala's initial impressions of who was at 'fault' for the fight were relied upon by the judge in ruling against [defendant]."

¶ 32 First, we cannot conclude that trial counsel's performance was deficient. This conclusion is based on the scope of the motion *in limine* and the reach of the trial court's *in limine* order. A motion *in limine* allows a party to obtain an order on the admissibility of evidence. *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 871 (2004). "The purpose of an *in limine* order is to exclude inadmissible evidence, not to create a trap that results in a new trial if the court determines in retrospect that the order was violated." *Id.* "It is well settled that both the motion *in limine* and the resulting order should be in writing to prevent confusion and misunderstanding during trial." *Id.*

¶ 33 "[A] court is disadvantaged in ruling on a motion *in limine* because it is considered in a vacuum, before the presentation of the full evidence at trial that may justify admission or require exclusion." *Id.* Thus, "[t]rial judges should attempt to enter narrow *in limine* orders, anticipate proper evidence that might be excluded by the orders, and make the orders clear and precise so

that all parties concerned have an accurate understanding of their limitations." *Id.* "An unclear order *in limine* is worse than no order at all[.]" *Id.*

¶ 34 "Once a motion *in limine* is [ruled on], [the party negatively affected] must be vigilant and object when evidence is presented which may violate the order." *Id.* "A new trial may be granted for a violation of an *in limine* order only if the order's prohibitions are specific, the violation is clear, and the violation deprived the [party negatively affected of] a fair trial." *Id.* at 872.

¶ 35 Here, the motion *in limine* concerned the admissibility of the video recordings made inside and outside the home. The State claimed that Zavala's statements on both recordings were hearsay yet admissible as excited utterances. See Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). The *in limine* order addressed that precise issue, *i.e.*, whether Zavala's statements *on the recording* were admissible under the excited utterance exception to the hearsay rule. The trial court ruled that (1) Zavala's statements on the inside recording were not excited utterances and (2) the outside recording was indiscernible and, to the extent Zavala could be heard, her statements were not excited utterances. Nothing in the State's motion *in limine* or the trial court's *in limine* order concerned Zavala's potential *testimony* about what she said inside or outside the home. Because the motion and the order did not concern Zavala's testimony, the *in limine* order was not violated when Zavala testified about what she said inside the home on the night of the incident. See *Larkin v. George*, 2016 IL App (1st) 152209, ¶ 12 (*in limine* order not violated when the "order did not completely prohibit the use of photographs but limited their use to show the 'point of impact' and not the extent of the damage of the vehicles involved in the accident[,]" and the photographs were properly used); *Carlson v. City Construction Co.*, 239 Ill. App. 3d 211, 240 (1992) ("[T]he motion *in limine* barred only evidence that City Construction was bankrupt, and made no mention of and hence did not bar any reference to 'missing City witnesses.' "). Thus, trial counsel did not open

the door for any improper testimony, as the *in limine* order never closed the door to Zavala's *testimony*, only to her *statements on the recording*.

¶ 36     Any contention that the *in limine* order barred Zavala from testifying about anything she said inside the home on the night of the incident simply cannot be correct.  The motion *in limine* sought to bar *unspecified statements* Zavala made inside the home.  An *in limine* order barring Zavala from testifying about everything she said would have been far too broad, as the trial court lacked the necessary context for such a ruling.  See *Kelley v. First State Bank of Princeton*, 81 Ill. App. 3d 402, 416 (1980) (motion *in limine* properly denied as too broad when it sought to bar " 'any conversations between the decedent *** and any other person' "); *Jeanguenat v. Zibert*, 78 Ill. App. 3d 948, 953 (1979) (denial of the plaintiff's motion *in limine* was proper because the motion sought to bar all evidence of the plaintiff's alcohol consumption, which would have excluded admissible evidence).

¶ 37     Moreover, if defendant wished to exclude *testimony* about specific statements Zavala made to defendant inside the home on the night of the incident, he easily could have filed his own motion seeking that specific relief.  See *Fakhoury v. Vapor Corp.*, 218 Ill. App. 3d 20, 23 (1991).  His attempt now to argue that admission of Zavala's testimony was error based on the State's motion *in limine* and the court's *in limine* order is simply misguided.  See *id.* at 23-24 (a motion *in limine* must be "sufficiently clear so that all parties understand its limitations and know what testimony is prohibited").

¶ 38     Although defendant's failure to establish trial counsel's deficient performance ends our inquiry (see *Boots*, 2022 IL App (2d) 200640, ¶ 35), we also conclude that defendant was not prejudiced by Zavala's testimony about what she told defendant inside the home.  The trial court found defendant guilty based on Linares' injuries, which it found consistent with Linares'

testimony, and on "the credibility of the witnesses." As to this last point, the court did not find Zavala credible. First, in finding defendant guilty, the court did not consider Zavala an "independent witness" given her relationships with defendant and Linares. Second, at the hearing on the posttrial motion, the court specifically stated that Zavala was not one of the witnesses it found credible. Thus, it seems clear that the court, in finding defendant guilty, did not consider anything Zavala said. See *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 65 (the trial court's ruling based on credibility findings suggested that the nonprevailing party's "incredible" evidence was not considered at all). Because the court did not consider anything Zavala said that night in finding defendant guilty, we cannot conclude that there is a "reasonable probability that, *** the result of the proceeding would have been different" if trial counsel had not questioned Zavala about what she told defendant inside the home. See *Strickland*, 466 U.S. at 694.

¶ 39                                    B. Posttrial Counsel

¶ 40     Before considering posttrial counsel's alleged ineffectiveness, we address the State's claim that defendant forfeited the issue "by failing to adequately develop such an argument on appeal." See Ill. S. Ct. R. 341(h) (eff. Oct. 1, 2020). We disagree. Defendant's brief alleges posttrial counsel's ineffectiveness and develops an argument supported by citations to the record and pertinent authority. Thus, we find no violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). See *id.* ("Points not argued are forfeited[.]").

¶ 41     Defendant claims that posttrial counsel was ineffective for failing to argue during posttrial proceedings that "it was unreasonable for the court to permit the admission of unduly prejudicial evidence that it had previously deemed inadmissible" in the *in limine* order. The "unduly prejudicial evidence *** previously deemed inadmissible" was Zavala's testimony, elicited over

trial counsel's objection, that she yelled "Stop it, Sanchez" while outside the home on the night of the incident. Defendant contends that posttrial counsel's performance was deficient because counsel did not raise the issue in a posttrial motion and thus failed to preserve the issue for appeal. See *People v. Cuevas*, 2018 IL App (2d) 151100, ¶ 25 (posttrial counsel may be ineffective for failing to preserve an issue for appeal by not raising it in a posttrial motion). Defendant further asserts that posttrial counsel was ineffective because he failed to raise trial counsel's ineffectiveness for opening the door for the State to ask Zavala what she said to defendant inside the home on the night of the incident. Defendant argues that posttrial counsel's performance was deficient because this error, too, was not preserved for appellate review. See *id.*

¶ 42    First, we cannot conclude that posttrial counsel was ineffective for failing to argue during posttrial proceedings that trial counsel was ineffective for opening the door for the State to question Zavala about what she said to defendant inside the home. Because, as we explained, trial counsel was not ineffective, posttrial counsel necessarily cannot be deemed ineffective for failing to raise trial counsel's alleged ineffectiveness. See *People v. Childress*, 191 Ill. 2d 168, 175 (2000) (appellate counsel cannot be deemed ineffective for failing to raise a nonmeritorious claim of trial counsel's ineffectiveness).

¶ 43    Second, we consider whether posttrial counsel was ineffective for failing to argue in posttrial proceedings that the trial court erred in overruling trial counsel's objection to the State's question about whether Zavala yelled, "Stop, Sanchez," to defendant outside the home. This issue—like the issue of whether trial counsel was ineffective for asking Zavala about statements she made *inside* the home—hinges on the scope of the State's motion *in limine* and the reach of the trial court's *in limine* order.

¶ 44    As noted, the motion *in limine* and the *in limine* order concerned the admissibility of the video *recordings* made inside and outside the home. Nothing in the State's motion *in limine* or the trial court's order concerned Zavala's *testimony* about what she said outside the home. Because the motion and the order did not concern Zavala's testimony, the *in limine* order was not violated when Zavala testified about what she yelled outside the home on the night of the incident. See *Larkin*, 2016 IL App (1st) 152209, ¶ 12; *Carlson*, 239 Ill. App. 3d at 240. Therefore, posttrial counsel did not perform deficiently in failing to argue that the trial court erred in permitting Zavala's testimony about what she said outside the home.

¶ 45    That said, as we noted in discussing whether trial counsel's performance was deficient, an *in limine* order barring Zavala from testifying about everything she said outside the home would have been improperly broad (see *Kelley*, 81 Ill. App. 3d at 416; *Jeanguenat*, 78 Ill. App. 3d at 953), and, if defendant wished to exclude *testimony* about specific statements Zavala made to defendant outside on the night of the incident, he easily could have filed his own motion and fashioned it that way (see *Fakhoury*, 218 Ill. App. 3d at 23).

¶ 46    Although defendant's failure to establish posttrial counsel's deficient performance ends our inquiry (see *Boots*, 2022 IL App (2d) 200640, ¶ 35), we briefly explain why defendant cannot establish that he was prejudiced when posttrial counsel did not argue in his posttrial motion that the trial court erred in allowing Zavala to testify about what she yelled to defendant outside the house. First, Zavala's explanation for why she yelled at only *defendant* to stop—she could control him and not the rage-prone Linares—was plausible and not inconsistent with defendant's position at trial that Linares was the aggressor. Second, Zavala was not the only witness who testified that she yelled for defendant to stop during the physical fight. Linares testified that Zavala screamed at both men to stop, and defendant specifically testified that Zavala yelled, "Stop, Sanchez."

Defendant has not claimed that either man's testimony was inadmissible. Last, although the court mentioned in finding defendant guilty that Zavala yelled, "Sanchez, stop[,]" the court never indicated the source of this evidence. As noted above, both Linares and defendant provided similar or the same testimony. Relatedly, as noted above, the court found Zavala incredible and did not rely on her testimony. Because the court did not consider what Zavala said, defendant was not adversely affected when Zavala testified about what she yelled outside the home on the night of the incident.

¶ 47                                    III. CONCLUSION

¶ 48     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 49     Affirmed.